# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>           v.<br><br>MARK RIDLEY-THOMAS,<br>    Defendant. | CR 21-485 DSF<br><br>Order DENYING Motion for Judgment of Acquittal; Order DENYING Motion for New Trial (Dkt. 359, 360) |

    After a jury trial, Defendant Mark Ridley-Thomas was convicted of one count of conspiracy, one count of federal programs bribery under 18 U.S.C. § 666, one count of honest services mail fraud, and four counts of honest services wire fraud. Defendant has now moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial under Rule 33.

## I. Summary of Evidence Presented at Trial

    The Court will not attempt to provide a detailed summary of the evidence presented in the lengthy trial; a brief outline will suffice for the purposes of this Order.

    The government's theory of the case encompassed several alleged instances of bribery involving Defendant, at the time a member of the Los Angeles County Board of Supervisors, and the then-Dean of the USC School of Social Work, Marilyn Flynn. The alleged benefits for Defendant involved Defendant's son, Sebastian Ridley-Thomas, who was a member of the California State Legislature at the time the alleged scheme began. Flynn was alleged to have needed to bring in

more funds for the School of Social Work, both to improve the school's financial viability and to promote her own career.  The government argued that the evidence at trial showed that Defendant demanded and received (1) admission to USC for his son, (2) a full tuition scholarship for his son, (3) a paid professorship for his son while he was a student at USC, and (4) an agreement to have USC help move money between Defendant's campaign fund and a nonprofit headed by Defendant's son under the auspices of United Ways of California.  Flynn and the USC School of Social Work, in exchange, were to receive several benefits including a partnership between the School and the "Vermont Reentry Center" run by the County, the establishment of a training center for the Probation Department – "Probation University" – run by the School, and the award of a renewed and expanded contract from the County for the provision of "telehealth" services.

However, the jury's mail and wire fraud convictions were exclusively based on the award of a contract extension granted by the County to the School of Social Work relating to the "Telehealth" program; Defendant was acquitted on the fraud charges relating to other County acts and USC-bestowed benefits.[1]

Regarding Telehealth, the government argued that Defendant voted in favor of the Telehealth extension, at least in part, pursuant to an agreement with Flynn to have USC "funnel" $100,000 from Defendant's campaign fund to United Ways.  The government asserted that this arrangement was motivated by Defendant's desire to fund a program that his son would head without it becoming known that it was being funded by Defendant.[2]  Further, the government presented

---

[1] Whether or not the jury could potentially have convicted Defendant of conspiracy or § 666 bribery based on allegations other than the Telehealth-related ones, the government limits its defense of the § 666 and conspiracy verdicts to evidence regarding the Telehealth contract.

[2] Part of the government's theory for why Defendant wanted secrecy, in addition to the generally questionable appearance of nepotism, is that

evidence that Defendant had previously tried to give money from his campaign fund directly to a different nonprofit, Community Partners, for the benefit of a different program associated with Defendant's son, but Community Partners rejected the money because it was concerned about the "optics" of the donation.

Significant evidence was presented by the government at trial through witnesses – primarily USC employees and the government's case agent – regarding the contracts at issue, the timing and machinations of the County's actions, Defendant and Flynn's statements and actions, and USC's perspective on providing certain benefits to Defendant's son.

Evidence showed that the School of Social Work was in a difficult financial situation and it needed an extension and expansion of the already-existing Telehealth program as part of its path to financial stability. Evidence further showed that Flynn told others in the School of Social Work that she "had to do a favor for someone" to get the Telehealth contract and that she had made a "side deal" with Defendant and his son related to the Telehealth contract.

On May 2, 2018, Defendant provided a $100,000 check to the School of Social Work from his campaign fund. The donation was purportedly to be "used at [Flynn's] discretion in order to best facilitate the impressive policy and practical work of the School and its impact in the community." Tr. Ex. 107. However, the next day, Defendant sent an e-mail to Flynn telling her that the $100,000 needed to be transferred to United Ways immediately in order to facilitate the hiring of an employee for Sebastian Ridley-Thomas's program. Tr. Ex. 335. Evidence showed that, over the next several days, Flynn took several steps within USC to have the money released to United Ways as soon as possible regardless of normal USC policy. Evidence also showed that Defendant communicated with United Ways to assure it that the money would be forthcoming from USC and that the hiring of the

---

Defendant's son was facing sexual harassment allegations in his role as a state legislator.

employee should continue. Ultimately, $100,000 was donated by USC to United Ways for the benefit of Sebastian Ridley-Thomas's program only seven days after $100,000 was received from Defendant's campaign fund.

According to the minutes of the Board of Supervisors, on July 18, 2018, Defendant voted to approve a renewed Telehealth contract to USC on the expanded terms requested by Flynn.

## II. Motion for Judgment of Acquittal

### A.  Legal Standard

The Court must "enter a judgment of acquittal if the Government fails to present sufficient evidence to sustain a conviction. Evidence is sufficient to sustain a conviction if, "viewed in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Miller, 953 F.3d 1095, 1108 (9th Cir. 2020) (simplified). "[E]vidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case." United States v. Nevils, 598 F.3d 1158, 1167 (9th Cir. 2010). However, "[c]onflicting evidence is to be resolved in favor of the jury verdict." United States v. Corona-Verbera, 509 F.3d 1105, 1117 (9th Cir. 2007). "The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010).

### B.  Mail and Wire Fraud Counts

#### 1.  Official Act

Defendant first argues that the government presented insufficient evidence of any official act taken by Defendant.

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy"

4

> must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

McDonnell v. United States, 579 U.S. 550, 574 (2016). In addition, "a public official is not required to actually make a decision or take an action on a question, matter, cause, suit, proceeding or controversy; it is enough that the official agree to do so." Id. at 572. "Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so." Id.

There is no question that Defendant performed a relevant "official act" – he voted in favor of the amended Telehealth contract that benefited USC and Flynn. Defendant argues that there was no evidence of Defendant's vote, but the minutes of the relevant proceedings are in evidence. Those minutes show that Defendant voted "aye" on the Telehealth extension. Tr. Ex. 577A. This is certainly evidence of a vote. Defendant attempts to avoid this evidence by pointing out that the vote was through a consent mechanism utilized by the Board, and the government never called any witnesses to explain the consent process. But the Court sees no reason why it should be the government's burden in this context to further establish that the vote documented in official records should be considered a "real" vote. There is, however, evidence in the record to show that the consent process

5

was utilized to approve – i.e., vote on – generally uncontroversial matters. Defendant's ultimate implication is presumably that Defendant's vote via the consent mechanism does not really rise to the level of a typical vote. But Defendant provides no reason to conclude that a vote on a "non-controversial" matter through a streamlined parliamentary process should count as less of an "official act" than any other vote by a public official. The only case he cites in support, United States v. Bryant, 885 F. Supp. 2d 749 (D.N.J. 2012), never questions that a vote on a measure that passes unanimously qualifies as an official act. Instead, the judge in Bryant found that, given the unanimous support of the voting body in question, the defendant's vote, in and of itself, did "not lend any credence to the Government's explanation that [the defendant] voted the way he did for an illegal purpose or that he had a corrupt intent when considering these bills." Id. at 764.

### 2. Material Act

The government also presented sufficient evidence for the jury to find that Defendant engaged in a material act. An act is material if it has "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." Neder v. United States, 527 U.S. 1, 16 (1999).

Defendant voted for the Telehealth contract. He was a member of the Board of Supervisors and had the direct ability to influence and, along with the other Supervisors, control the acts of the County of Los Angeles through his position. While somewhat lost in the parties' arguments, this is sufficiently material for the purposes of honest services fraud. At the very least, Defendant's vote had "a natural tendency to influence" the County's actions, even if the Telehealth amendment would have passed, in this instance, without Defendant's vote.[3]

---

[3] The government makes an extensive argument about Defendant's acts with respect to USC. Defendant counters that "[t]he materiality requirement relates to acts performed against the party to whom the fiduciary duty is

### 3. Breach of Fiduciary Duty

Defendant argues that the government presented no evidence of a breach of fiduciary duty by Defendant. This is unpersuasive. First, the parties stipulated that Defendant had a fiduciary duty to the citizens of the County of Los Angeles. Second, the Court agrees with the government that honest services mail and wire fraud do not require a separate explicit finding of a breach of fiduciary duty because the taking of bribes or kickbacks is, as a matter of law, a breach of the fiduciary duty owed by a public official. The reasoning employed by the Supreme Court in Skilling to limit honest services fraud charges to bribery and kickbacks is permeated by the assumption that the taking of bribes and kickbacks is obviously a violation of an official's fiduciary duties. See Skilling v. United States, 561 U.S. 358, 407 (2010) ("The "vast majority" of the honest-services cases involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes."); id. at 412 ("As to fair notice, whatever the school of thought concerning the scope and meaning of § 1346, it has always been 'as plain as a pikestaff that' bribes and kickbacks constitute honest-

---

owed, in this case the County of Los Angeles, not USC." Rule 29 Reply at 6. The Court doubts that the materiality requirement in this context is so limited. Many species of fraud do not involve material acts directed at the ultimate victim; the acts involved are material to the person to which they are addressed during the execution of the fraud. For example, property in the possession of a third-party could be obtained through fraudulent means without any contact between the perpetrator and ultimate victim. And, in the specific case of honest services fraud, kickback schemes would not necessarily require any material acts to be directed at the person or entity to whom the fiduciary duty is owed; most of the relevant acts would be between the giver and receiver of the kickbacks. Defendant's citation to United States v. Milovanovic, 678 F.3d 713, 727 (9th Cir. 2012), is unpersuasive. The Court does not believe that the panel in that case intended to limit materiality to the "employer's" point of view – that was simply the factual context in which that case arose. However, putting aside any acts directed at USC, Defendant's vote in favor of the Telehealth extension was clearly material given his position as a County Supervisor.

7

services fraud"); id. at 416 ("The Court maintains that the intangible right of honest services means the right not to have one's fiduciaries accept bribes or kickbacks.") (Scalia, J., concurring). The obviousness of the breach is one of the main reasons the Supreme Court upheld § 1346 in the context of bribery and kickbacks as opposed to rejecting the statute as unconstitutionally vague.

### 4. Failure to Disclose

Defendant claims that the government based at least part of its argument on Defendant's mere failure to disclose the "funneling" of $100,000 in funds from Defendant's campaign account to United Ways though USC. This is not an accurate characterization of the government's argument. The government alleged that Defendant was interested in concealing the movement of money, whether legal or not, between his campaign account and United Ways for the benefit of Defendant's son's project. In the government's theory of the case, the desire to hide the $100,000 payment was Defendant's *motive* for entering into the bribery agreement; the nondisclosure of the payment, in and of itself, was not the basis of the charge.

### 5. Quid Pro Quo

Defendant also argues that the government did not prove the foundational "quid pro quo" required for bribery. Viewing the evidence in the light most favorable to the prosecution, there was ample evidence to support the finding that Flynn provided benefits to Defendant in exchange for Defendant's vote on the Telehealth contract. There was direct evidence of Flynn's characterization of having to do "a favor" to get the contract and that she had a "side deal" with Defendant and his son. Significant circumstantial evidence also supports a finding of a quid pro quo, including language in communications between Defendant and Flynn and the timing of events and communications between them. That alternative interpretations of the evidence may also be plausible is not grounds to overturn a jury verdict.

8

### C. Bribery Count

As to the bribery count under 18 U.S.C. § 666, Defendant argues that there was no evidence that the County business at issue was at least $5,000. This has no merit. The Telehealth contract, on its face, was worth over $500,000. Evidence showed that the entire premise of Flynn's participation in the scheme was to sustain the economic viability of the Telehealth project and to bring substantial money into the USC School of Social Work. There is no question that sufficient evidence in the record supported the jury's finding that the government business exceeded $5,000.

Similar to the quid pro quo argument rejected above, there is also substantial evidence of Defendant's corrupt intent. This is demonstrated by the way Defendant characterized his donation to USC as being important to support the School of Social Work, even though he knew that it would immediately be sent to United Ways. It is also demonstrated by the general circumstances of the communications between Defendant and Flynn if inferences are drawn in the light most favorable to the prosecution. Viewed in the light most favorable to the prosecution, the jury could easily find that Defendant knew he was acting corruptly and dishonestly in structuring the $100,000 donation in return for his assistance with the Telehealth contract.

Finally, contrary to Defendant's argument, § 666 bribery does not require a specific quid pro quo of benefits in exchange for an official act. United States v. Garrido, 713 F.3d 985, 996-97 (9th Cir. 2013).

### D. Conspiracy

Defendant also independently attacks the conspiracy verdict, arguing that the government never demonstrated the required meeting of the minds between Defendant and Flynn. But, again, and for many of the reasons already discussed, the evidence, viewed in the light most favorable to the government, shows that there was an agreement between Defendant and Flynn to provide County business to USC in exchange for Flynn's assistance in concealing the nature and source of the payment between Defendant's campaign fund and United Ways.

This is shown both by the direct statements of Flynn referenced above and the inferences that can be made from the timing and content of the communications between Defendant and Flynn.

### III. Motion for New Trial

A.    **Legal Standard**

The Court may set aside the jury verdict and order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial should be granted only "in exceptional circumstances in which the evidence weighs heavily against the verdict." United States v. Del Toro-Barboza, 673 F.3d 1136, 1153 (9th Cir. 2012) (quoting United States v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981). "The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000). "[A] decision to grant or deny a new trial is within the sound discretion of the district court." United States v. Steel, 759 F.2d 706, 713 (9th Cir. 1985).

If a purported error was not brought to the Court's attention before or during the trial, it is evaluated under a plain error standard. Fed. R. Crim. P. 52(b).

> "[P]lain-error review"—involves four steps, or prongs. First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, *i.e.,* affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the [underlying] proceedings. Fourth and finally, if the above three prongs are satisfied, the court . . . has the *discretion*

> to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. Meeting all four prongs is difficult, as it should be.

Puckett v. United States, 556 U.S. 129, 135 (2009) (emphasis in original) (simplified).

## B. Agent Testimony

Defendant claims that the case agent, Brian Adkins, made three false statements in his testimony: (1) that he reviewed all 400,000 documents produced by the government, (2) that John Sherin indicated that some of his justifications for the Telehealth extension were not genuine, and (3) that unspecified witnesses said that either Defendant or his staff threatened to cancel or rescind a contract. See Rule 33 Motion at 5-6.

> [A] conviction will be reversed if two conditions are met: first, the prosecution knowingly presented false evidence or testimony at trial; and, second, it was material, that is, there is a reasonable likelihood that the false evidence or testimony could have affected the judgment of the jury.

Morris v. Ylst, 447 F.3d 735, 743 (9th Cir. 2006).

As for the review of documents, it is by no means clear that Adkins intended to mislead the jury about the extent of his review. Second, Adkins's incorrect (or false) testimony was both brought out on cross-examination and was subject to a curative instruction issued by the Court. The instruction explicitly pointed out the inconsistency in Adkins's testimony and told the jury that they can consider the inconsistency in evaluating Adkins's credibility. This was sufficient to remedy any prejudice that Defendant might have suffered absent the instruction.[4]

---

[4] The Court is not convinced that Adkins's incorrect testimony would have had any meaningful impact on the result in any event, but, even if it would

11

As for the other two purported false statements, the Court agrees with the government's characterization of the testimony. Defense counsel asked questions that virtually invited Adkins to provide his own interpretation of the evidence he had found. And when Adkins provided his opinion about the evidence, defense counsel did not follow up for specifics or to probe the foundation for Adkins's beliefs. The government provides plausible explanations for Adkins's testimony based on the record. Defendant is now asking the Court to assume that Adkins intended to mislead without any evidence of this in the record. Given the government's plausible explanations of what Adkins was referring to, the Court cannot say that Adkins intended to lie, that government counsel intended to elicit false testimony, or that either even negligently misled the jury.

Testimony by Adkins about his views on the case were appropriately allowed in the context in which they were elicited. The government did not elicit any of the testimony at issue during direct examination. During cross-examination, defense counsel extensively challenged Adkins on whether the investigation into Defendant was thorough, fair, and unbiased. See generally Rule 33 Opp'n at 18-21 (government's summary of cross-examination). Specifically, counsel asked Adkins to opine on whether he viewed certain things as "corrupt." Once Defendant inquired into Adkins's views on the evidence, it was fair on redirect for the government to allow Adkins the opportunity to elaborate on why he conducted the investigation as he did and why he may have viewed certain evidence as evidence of corruption or corrupt intent in the course of that investigation.

Defendant also argues that government counsel vouched for the credibility of Adkins's testimony. Given a lack of direct statements by government counsel, it appears that Defendant is characterizing counsel's questions themselves to be a form of vouching. See Rule 33 Motion at 9-10; Reply at 7-8. Vouching occurs when the prosecutor

---

have, both cross-examination and the corrective instruction certainly eliminated any prejudice.

"plac[es] the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993). It is unclear how the questions themselves could be seen as vouching for Adkins; in fact, the government in opposition appears to interpret the issue as being about *Adkins's* alleged vouching, see Rule 33 Opp'n at 23-26, even though Defendant seems also to be attacking vouching by counsel. In any event, there was nothing done during Adkins's testimony that could fairly be considered vouching by counsel, let alone vouching that would be prejudicial.

### C.   Closing and Rebuttal Argument

Defendant makes several arguments related to the government's initial and rebuttal closing arguments.

First, he argues that the government improperly impugned defense counsel when government counsel questioned the accuracy of testimony presented in a PowerPoint presented to the jury during Defendant's closing. Specifically, government counsel argued that the PowerPoint's text "was represented as testimony in the form of a transcript" and might "even be incorrect." While the Court did take issue with government counsel's tone and choice of words, the substance of counsel's point was reasonable and accurate. His point was that the evidence was not what defense counsel put in a PowerPoint at closing; the evidence was the testimony as the jurors remembered it. In fact, the Court gave an instruction to that effect. Government counsel's ultimately fair and accurate point, even if it could have been worded more artfully, did not impugn counsel or unfairly prejudice Defendant.

Defendant also claims that the government impugned defense counsel by its characterization of Defendant's position as a "manufactured defense." First, substantively identical language in closing has been found to be in the range of acceptably prosecutorial argument. United States v. Ruiz, 710 F.3d 1077, 1086 (9th Cir. 2013)

13

("[T]he prosecutor's characterization of the defense's case as 'smoke and mirrors' was not misconduct."). Second, the language used, in context, clearly refers to the government's position that Defendant's explanation of the facts was self-serving and not a reasonable interpretation of the evidence presented at trial. A reasonable juror would not have viewed it as an accusation that defense counsel was lying or otherwise personally intended to mislead the jurors regarding the evidence. And even if the government could have chosen different words, a single use of the fairly benign and easily understood rhetoric of "manufactured defense" could not and did not affect the outcome of the trial.

There was also no improper vouching by government counsel in closing arguments. The statements made in closing – *e.g.*, that Defendant tried to conceal his actions because otherwise he might be prosecuted, characterizing testimony as seeming to be "crazy" or "nonsense" or characterizing other evidence as "crystal clear"[5] – are easily within the range of acceptable argument and comment on the evidence. Nowhere did counsel suggest that the jury should view the evidence in a certain way simply because she personally believed in that view of the evidence. The comments at issue were made in the context of comment on specific evidence and arguments about how that evidence should be reasonably interpreted. Further, other than the comment regarding possible prosecution, Defendant failed to object to any of the alleged vouching during trial. Under a plain error standard, it was not "clear and obvious" that calling testimony "nonsense" or "crystal clear" was vouching that the Court should have halted without an objection.

Defendant also objects to the use of the term "funneling" to describe that movement of money between his campaign fund to United

---

[5] The other statements Defendant objects to are even more clearly acceptable comments on the evidence – so much so that it is difficult to understand what the objection is supposed to be. Defendant certainly makes no attempt to elaborate his objections other than a conclusory statement that "[t]hese examples fall outside the bounds of appropriate argument." See Rule 33 Motion at 12-13.

Ways via USC.  There was no objection to the use of the term before or during trial and it was not plain error to allow it.  The Court sees no reason not to allow the use of a word that arguably fairly characterized what happened.  Defendant moved money from his campaign fund to USC with full knowledge and intent that the money would be almost immediately transferred from USC to United Ways.  The Court also allowed the testimony of an expert witness specifically to allow Defendant to rebut any inference that might be made that the "funneling" in and of itself was illegal.  Nor did the government argue that it was illegal.[6]

Defendant argues that the government misrepresented the law of honest services wire and mail fraud in its closing.  The government argued that Defendant's instructions to one of his staff was an "official act."  Whether or not this would actually qualify as an "official act" under the law, there is no indication that the government was trying to mislead the jury regarding the law.  The government has a cogent argument for why this could be considered an official act as the jury was instructed by the Court.  The government could certainly be *wrong* on how to construe the evidence in light of the instructions, but it was for the jury to decide that point.

The government also did not misstate the law when it argued that Defendant "monetized" his office or stated that Defendant had "a conflict of interest."  The use of "monetized," if inaccurate at all, would be an inaccurate interpretation of the *facts*.  Defendant provides no explanation for how this characterization is a misstatement of *law*.  It was also fair for the government to point out that Defendant had a conflict of interest based on the evidence presented so long as the government did not assert that Defendant could be convicted based on the conflict of interest alone.  The government never did so.

---

[6] Government counsel did make the statement that the fact that the "funneling" did not violate campaign finance laws "seems crazy," but she did not contest that the "funneling" was actually legal.

15

Finally, Defendant takes issue with several statements made in the government's closing arguments that Defendant could be convicted of § 666 bribery even if he received payment for things he was already going to do. But this argument is consistent with the Court's instructions, which Defendant does not directly contend were inaccurate:

> If you find that the elements of bribery described above are otherwise satisfied, it is not a defense that any acts taken were good for the community or were acts that defendant would have or should have taken without the bribe.

Dkt. 285 at 24.

The important point is the admonition that "the elements of bribery described above are otherwise satisfied." Nowhere did the government or the Court's instructions suggest that Defendant could be convicted for accepting a gratuity alone. Especially in his reply, Defendant implicitly attacks the Court's instruction quoted above by arguing that the cases that support it were based on 18 U.S.C. § 201. But that does not help Defendant because the cases involve § 201 *bribery*, not the gratuities portion of that statute. There is no reason to think – nor does Defendant attempt to provide a reason – that § 666 bribery is more limited than § 201 bribery.[7]

## D. Cumulative Error

Because the Court has found no error in any of the points raised by Defendant in his motion, there is also not sufficient cumulative error to call for a new trial.

---

[7] There is an argument that § 666 may encompass the receipt of what could be considered a gratuity in at least some contexts, but the government does not argue that Defendant could have been convicted on a gratuities theory.

16

## IV. Conclusion

The motion for judgment of acquittal and the motion for a new trial are DENIED.

IT IS SO ORDERED.

Date: June 30, 2023

Dale S. Fischer
United States District Judge