DARALYN J. DURIE (SBN 169825)
ddurie@mofo.com
ARTURO J. GONZALEZ (SBN 121490)
agonzalez@mofo.com
GALIA Z. AMRAM (SBN 250551)
gamram@mofo.com
RAMSEY W. FISHER (SBN 334228)
ramseyfisher@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415-268-7000
Facsimile: 415-268-7522

CHRISTINA M. RANDALL (SBN 320125)
crandall@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone: 213-892-5200
Facsimile: 213-892-5454

Attorneys for Defendant
MARK RIDLEY-THOMAS

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-cr-00485-DSF |
| Plaintiff, | **DECLARATION OF GALIA Z. AMRAM IN SUPPORT OF DEFENDANT MARK RIDLEY-THOMAS'S MOTION FOR BAIL PENDING APPEAL** |
| v. | |
| MARK RIDLEY-THOMAS, et al., | |
| Defendants. | Date:        October 30, 2023
Time:        8:30 a.m.
Courtroom:   7D
Judge:       Hon. Dale S. Fischer |

I, Galia Z. Amram, declare as follows:

1.      I am an attorney admitted to practice in the State of California and a member of the bar of this Court.  I am an attorney at the law firm of Morrison & Foerster LLP, counsel for Defendant Mark Ridley-Thomas.  I submit this declaration in support of Defendant Mark Ridley-Thomas's Motion for Bail Pending Appeal.  I have personal knowledge of the facts stated herein and could and would testify competently thereto if called as a witness in this matter.

2.      Attached hereto as Exhibit A is a true and correct copy of excerpts from the official Trial Transcript.

3.      Attached hereto as Exhibit 576 is a true and correct excerpted copy of the Government's Trial Exhibit 576.

4.      Attached hereto as Exhibit 1076 is a true and correct excerpted copy of the Defendant's Trial Exhibit 1076.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed October 2, 2023, at Alameda, California.


                                                            */s/ Galia Z. Amram*
                                                            GALIA Z. AMRAM

# EXHIBIT A

1     UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3      WESTERN DIVISION

4  THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6 UNITED STATES OF AMERICA,   )
              )
7       Plaintiff,  )
              )
8    vs.      ) NO. CR 21-485-DSF
              )
9 MARK RIDLEY-THOMAS,     )
              )
10      Defendant.  )
  _____)

11

12

13

14   REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16    Los Angeles, California

17   Tuesday, March 7, 2023, 8:37 A.M.

18

19  Day 1 of Jury Trial, Page 1 to 152, Inclusive

20

21
         PAT CUNEO CSR 1600
22         Official Reporter
         First Street Courthouse
23         350 West 1st Street
         Room 4311
24         Los Angeles, CA 90012
         213-894-1782
25         patcuneo1600@gmail.com
         www.patcuneo.com

```
 1              THE COURT:  Good morning.

 2              THE PROSPECTIVE JUROR:  I'm Ashley.  My area of

 3    residence, I stay in Los Angeles, California.  Highest

 4    education, some college.  I did graduate from Bellflower

 5    High School.  Right now I'm unemployed, but I was working at

 6    LAX for parking with Uber.

 7              My marital status is that I'm single.  I have a

 8    daughter.  She'll be 18 in March.  I've never done anything

 9    like this at all.  This is my very, very first time ever, so

10    with the grand jury I have no experience with that.

11              THE COURT:  All right.  Well, you couldn't tell it

12    by me.  You have done a fine job of showing everybody else

13    how this should be done.  So pass your microphone off to

14    Juror No. 2 and we'll hear from Juror No. 2.

15              THE PROSPECTIVE JUROR:  My name is Marisella.  I

16    reside in the San Fernando Valley.  My highest level of

17    education is high school diploma, some college.  I did not

18    graduate.  I am married.  My husband works -- or I work at

19    Health Nut doing customer service.  My husband works at

20    Sherman Oaks Hospital doing medical billing.  I have a

21    20-year-old son.  He works in sales at Toyota of Northridge.

22    And I've never been on a jury before.

23              THE COURT:  Thank you.

24              Juror No. 3.

25              THE PROSPECTIVE JUROR:  Good morning.  I live in
```

1          THE COURT:  I see one hand over there, right?

2    Raise your hand high.  Okay.

3          We're just talking to the 18 people.  Okay?  Thank

4    you.  None of those?  All right.

5          23:  Do you think it's appropriate for

6    universities to consider race or legacy as a factor in

7    determining admission?  And "legacy" may be a term most

8    people haven't heard.  That's where a child attends the same

9    university as his or her parents.

10         Does anyone have a "yes" answer to that question?

11   Any one over here?

12                      *(No response.)*

13         THE COURT:  Nobody thinks that's appropriate?

14         Anybody have a "yes" answer out here?

15               *(A prospective juror responded.)*

16         THE COURT:  Yes.  Juror No. 13.

17         THE PROSPECTIVE JUROR:  Umm, yes, because

18   affirmative action currently is the law and so a lot of

19   universities do consider race when it comes to college

20   admissions and legacy -- a lot of institutions have legacy

21   admissions so it's a current practice.

22         THE COURT:  All right.  Anybody else?

23         THE PROSPECTIVE JUROR:  I think legacy is okay

24   when determining admission.

25         THE COURT:  That's Juror No. 15?

| | |
|---|---|
| 1 | THE PROSPECTIVE JUROR:  16. |
| 2 | THE COURT:  16.  Thank you. |
| 3 | All right.  Thank you. |
| 4 | Maybe I should ask it a different way:  Is there |
| 5 | anybody who feels that race and legacy definitely should not |
| 6 | be considered?  Strong view one way or the other? |
| 7 | *(The prospective jurors responded.)* |
| 8 | THE COURT:  Yes.  Juror No. -- |
| 9 | THE PROSPECTIVE JUROR:  10. |
| 10 | THE COURT:  10.  Thank you. |
| 11 | THE PROSPECTIVE JUROR:  Yeah, I've got a problem |
| 12 | with legacy.  Just because your parents went to Stanford, |
| 13 | why should you get into Stanford?  There are probably other |
| 14 | perfectly well-qualified applicants to get admission; and |
| 15 | why should a -- *(sound off)* this condition of being a child |
| 16 | of Stanford graduates allow you to get into Stanford. |
| 17 | THE COURT:  I think the microphone was turned off |
| 18 | or the battery didn't work. |
| 19 | All right.  Would that opinion affect your ability |
| 20 | to be fair in this case?  I think we have talked a bit about |
| 21 | it. |
| 22 | THE PROSPECTIVE JUROR:  No, Your Honor. |
| 23 | THE COURT:  All right.  Thank you. |
| 24 | Did I miss anybody? |
| 25 | *(No response.)* |

1          MR. MORSE:  Okay.  And I made some notes about

2    your education.  I may have missed it.  Is any part of your

3    education related to government or government

4    administration?

5          THE PROSPECTIVE JUROR:  Not US government.

6    Chinese government administration maybe, yes, and economics.

7          MR. MORSE:  Okay.  Thank you.

8          And a last follow-up question for you, Prospective

9    Juror No. 13.  You mentioned that you felt it appropriate

10   that universities consider whether someone is a legacy when

11   that individual is going through the admissions process; is

12   that what you said?

13         THE PROSPECTIVE JUROR:  Yes.  Because they have a

14   percentage of legacy admissions and then they also have a

15   percentage of race-based admissions.  I know that that is

16   the current way that universities bring on students.

17         MR. MORSE:  And when you say that's the current

18   way that universities bring on students, is that your

19   understanding of the law and of the current practice?

20         THE PROSPECTIVE JUROR:  Not my understanding of

21   the law.  Just my understanding of the current practice

22   based on like experiences with admissions and stuff like

23   that.

24         MR. MORSE:  Got it.  And so understanding that

25   that's the current practice with respect to admissions, do

1   you have an opinion about legacy admits separate from what

2   you understand the practice to be?

3            In other words, do you think that's fair?  Do you

4   think that's unfair?  You have no opinion?  What do you

5   think?

6            THE PROSPECTIVE JUROR:  I don't have enough

7   information to formulate an opinion whether it's fair or not

8   and I don't look at the data so I don't know.

9            MR. MORSE:  Okay.  Thank you very much.

10           And Prospective Juror No. 5, what area did you say

11  you live in?  Was that in South L.A.?

12           THE PROSPECTIVE JUROR:  That's in South Central of

13  Los Angeles, yes.

14           MR. MORSE:  And did you grow up in that area?

15           THE PROSPECTIVE JUROR:  Yes.

16           MR. MORSE:  Okay.  Great.

17           And in South L.A. or South Central Los Angeles,

18  have you ever been involved in any like any local politics

19  or local policy sort of political events or anything like

20  that?

21           THE PROSPECTIVE JUROR:  No, not at all.

22           MR. MORSE:  Okay.  And with respect to -- have you

23  ever been involved in any sort of nonprofit agencies or any

24  sort of organizations that advocate in general?

25           THE PROSPECTIVE JUROR:  I've worked for a homeless

```
 1              MR. GONZALEZ:  How long has he been a sheriff?

 2              THE PROSPECTIVE JUROR:  Honestly, I don't talk to

 3    him that often.  I think I've seen him maybe once in the

 4    last ten years (laughing).

 5              MR. GONZALEZ:  All right.  That answers my

 6    question.

 7              Thank you, ma'am, very much.

 8              Thank you, Your Honor.

 9              THE COURT:  Thank you.

10              All right.  Peremptories -- any other cause?

11              MR. MORSE:  Not from the government, Your Honor.

12              MR. GONZALEZ:  No, Your Honor.

13              THE COURT:  All right.  So the peremptory is with

14    the government.

15              MR. MORSE:  Yes, Your Honor.  Shall we meet and

16    confer with counsel?

17              THE COURT:  Yes, please.

18                        (Counsel conferred.)

19                      (Pause in the proceedings.)

20              MR. MORSE:  Your Honor, the government would like

21    to please thank and excuse Prospective Juror No. 13.

22              THE COURT:  All right.  Juror No. 13.

23              MS. DURIE:  Your Honor, may we be heard?

24              THE COURT:  Wait a minute.  What was the whole

25    point of that?
```

```
 1  were based on.
 2          And we put forth a peremptory challenge because
 3  she said she didn't have enough information.  She, in a
 4  conclusory way, said this was the practice.  She expressed
 5  no opinion regarding legacy and we're interested in knowing
 6  that.  For that reason, we moved for a peremptory.  She also
 7  has experience with local government.
 8          MS. DOTSON:  May I add to that, Your Honor?
 9          THE COURT:  Yes.
10          MS. DOTSON:  In addition, she multiple times
11  talked about what the law is and what is legal.  She talked
12  about in working for local government.  She dealt with
13  hearings.  She also talked about having a dual Bachelor's.
14  Also, obviously, the issues in this case, those are just
15  some additional things that we considered in this case.
16          MS. DURIE:  And --
17          THE COURT:  Yes.
18          MS. DURIE:  So in terms of the assertively
19  non-pretextural justification for striking Juror No. 13, the
20  fact that she responded to a question in a conclusory way is
21  not anything that would give rise to concluding that that
22  juror was predisposed one way or another on the issues.
23          For the exercise of a peremptory challenge, it
24  seems like the asserted basis for the challenge was that she
25  had no opinion.
```

```
 1   level, without considering the response, that I would go

 2   ahead and say there was, I guess trying to figure out how to

 3   do this so it's not complicated.

 4           I'm supposed to consider the total of the relevant

 5   facts and some of the facts you mentioned really aren't

 6   relevant yet because there has just been the first

 7   challenge.

 8           So the fact that the first challenge wasn't to one

 9   of the several other people who have one or more degrees, I

10   don't think at this point really helps me.

11           The cognizable group it can be an applicant so the

12   facts we have two Blacks and one Asian, I guess, although I

13   have to say that I, in my experience, Asians are much more

14   law enforcement oriented than defense oriented.

15           But that still is a cognizable group so it's

16   rather early in the process to make any real analysis about

17   any of the other issues.  So I think based on the

18   information that I have so far --

19           MS. DOTSON:  Your Honor, may I add something just

20   for the record?

21           THE COURT:  Yes.

22           MS. DOTSON:  The two individuals that the defense

23   questioned, Juror No. 6, who I believe is a Hispanic female,

24   and Juror No. 18, he's a Hispanic male.

25           THE COURT:  I had Hispanic.
```

```
 1            MS. DOTSON:  And the government is not challenging
 2    that.  I just want to put on the record that there is any
 3    sort of anything because of the questioning of two of those
 4    jurors.
 5            MR. MORSE:  It appears the panel is mostly --
 6            MS. DOTSON:  The panel is mostly nonwhite.
 7            THE COURT:  I have never seen a panel with this
 8    few white people.
 9            MS. DURIE:  So can I see on the point of
10    questioning.  We haven't exercised a challenge or at least
11    not one.  We actually -- I think maybe is a white male so.
12            Your Honor, I understand -- I do understand the
13    Court's concern.  I would note that no questions were asked
14    of some of the other people on the panel with advanced
15    degrees and it is the absence of that question and the
16    absence of any nexus between anything in this case and the
17    fact of having a dual Bachelor's degree that that is the
18    specific justification that suggests it's pretextural.
19            I understand sort of the Court's view.  It's
20    possible to reach a conclusion.  There are cases that have
21    done so even on a first challenge.
22            THE COURT:  I understand that.
23            MS. DURIE:  That there is not a sufficient
24    non-pretextural asserted justification.  And I would just
25    leave it at that.  I understand the Court's position.
```

1    please thank and excuse Juror No. 1.

2              MS. DURIE:  So we are going to renew, Your Honor.

3              THE COURT:  So we'll do that.

4              MR. GONZALEZ:  Now we're down to 11.

5              THE COURT:  We have to bring Juror No. 1 back

6    because the remedy is if I granted the challenge is we keep

7    Juror No. 1.

8              MR. GONZALEZ:  Yes, exactly.

9              THE COURT:  All right.  Let's go.

10       *(The following was in the prospective jurors' presence:)*

11             THE COURT:  All right.  Sorry, ladies and

12   gentlemen, for the long break.  We're going to take a break

13   for lunch in just a couple of minutes.

14             Juror No. 13, you're excused.  You're ordered to

15   return to the jury room.

16             Juror No. 8, you're excused.  You're ordered to

17   return to the jury room.

18             Juror No. 15, please take seat No. 8.  You're now

19   Juror No. 8.

20             Juror No. 11, you're excused.  You're ordered to

21   return to the jury room.

22             Juror No. 16, please take seat No. 11.  You're now

23   Juror No. 11.

24             Juror No. 10, you're excused.  You're ordered to

25   return to the jury room.

1    to the threshold showing which the Court previously noted is

2    a low one.  We had relied previously on the fact that during

3    jury voir dire the government only asked detailed questions

4    of three jurors, all of whom were minorities and two of whom

5    were Black and that's questions asked in our view of the

6    Black jurors in particular seemed intended to try to elicit

7    bases upon which a peremptory challenge could be used.

8            With respect specifically to the strike to Juror

9    No. 1, she said nothing that would warrant the exercise of a

10   peremptory challenge against her and she would now be the

11   second Black female and the only remaining Black female on

12   the jury.

13           This is a high-profile case.  It is one in which

14   race plays an obvious and important issue.  I think everyone

15   in this courtroom understands that and understands that it

16   is particularly crucial that jury selection in this case be

17   free of any potential taint of bias.

18           And for that reason, Your Honor, we do believe

19   that the challenge to Juror No. 1 is inappropriate and we

20   would request that she be reinstated and remain on the jury.

21           MR. MORSE:  Your Honor, may I respond?

22           THE COURT:  Yes.

23           MR. MORSE:  Thank you.

24           As the Court noted at sidebar, this is a

25   predominantly nonwhite panel that we have been posing

1    questions to throughout this morning.

2           Now, with respect to Juror No. 1, the government

3    exercised a peremptory challenge for essentially three

4    reasons.

5           Number one, when the Court was reading the summary

6    of this case, Juror No. 1, Prospective Juror No. 1, we noted

7    that she was shaking her head and she had her head tilted

8    downward.

9           Number two, she's had sunglasses on for the

10   majority of the jury questioning.  I believe she only took

11   them off when the Court was directly addressing her.

12          Number three, she's also unemployed.  So those are

13   the reasons that the government is seeking to have the Court

14   exclude or excuse -- excuse me -- Prospective Juror No. 1.

15          We'd also note, Your Honor, currently on the panel

16   there are still two Black males and, again, this is a

17   predominantly nonwhite panel.

18          The defense has, I believe, excluded three

19   Hispanic individuals as well; and the government is not

20   putting forth the Batson; and that's because this is

21   predominantly a nonwhite panel.

22          So it would make sense that the majority of the

23   peremptories, just by the numbers alone, would be used on

24   nonwhite individuals.

25          So we do not believe that there's a *prima facie*

```
1              THE COURT:  Anything else from the defense?

2              MS. DURIE:  Yes, Your Honor.

3              There were three asserted justifications put

4  forward for striking Juror No. 1.  The first that was that

5  she was purportedly looking down and shaking her head when

6  the statement of charges were read.

7              I was watching the jury as were my cocounsel when

8  the statement of charges were read.  We did not observe that

9  behavior.

10             I will note that many of the prosecution had their

11 back to the jury but I will say I was watching the jury in

12 general pretty carefully.  I did not see that.

13             The second asserted justification is that she was

14 wearing tinted glasses.  I would note that those tinted

15 glasses appear consistent, generally speaking, with her

16 clothing and her presentation.

17             And courts have found that identifying clothing,

18 hairstyle, other accouterments of presentation in that

19 regard can itself be a form of racial stereotyping and is

20 not a racially neutral explanation for the exercise of a

21 strike.

22             The third asserted justification is that she is

23 unemployed.  She gave her history of employment.  It is true

24 that she said she is unemployed right now but she has

25 previously been employed.
```

```
 1            Moreover, unemployment is also tied as
 2    unfortunately we all know to race.  Individuals who are of
 3    racial minorities are more likely to be unemployed and so
 4    simply pointing to the fact that she presently is unemployed
 5    is not a racially neutral explanation.
 6            The question for the Court is what is the better
 7    inference for the government's exercise of a strike?  Is the
 8    better inference that it is something that is racially
 9    neutral and untied to Juror No. 1's race or is the better
10    inference that it was a racially motivated -- whether
11    explicitly or implicitly because we all know about implicit
12    bias -- whether it was explicitly or implicitly even
13    motivated by race and trying to seize about characteristics
14    that are racially motivated.
15            We would ask the Court to reinstate -- to allow
16    Juror No. 1 to remain on the jury.
17            THE COURT:  Well, as I said with the very low
18    standard of making a prima facie case, I do find there's a
19    prima facie case just based on the information provided by
20    the defense and I'm -- it's as low as it can get at this
21    stage of the proceedings because, as I've pointed out, then
22    the government has -- identifying these jurors, it is, as I
23    said, I've never seen so few Caucasian jurors in all -- I've
24    been doing this since 1997 on the state court, in 2003 here.
25            So I recognize that it's difficult to exercise a
```

1    challenge statistically without exercising a challenge

2    against a member of a minority.

3              MS. DURIE:  Your Honor, may I be heard on that

4    point because I take the point about the composition of the

5    panel as a whole.

6              But I am talking here specifically in terms of the

7    exercise of challenges, about exercise of challenges to

8    Black jurors.

9              There are four Black jurors on the panel.  The

10   government has now purports to strike the second of those

11   four.  So I think that when I say this is a case about race,

12   it is a case about race but it is also a case about a

13   prominent Black politician in Los Angeles.

14             And I do think it is critically important that

15   this not be seen to be racially motivated; that the

16   selection of the jury ultimately not be seen as to be

17   racially motivated in any way.

18             Two of the three jurors who were questioned

19   extensively were Black and we are now talking about striking

20   the second Black and the only other Black woman on the

21   panel.

22             THE COURT:  I understand that but I'm going to

23   follow the law and the composition of the final jury is the

24   composition of the final jury.  I'm not doing this for how

25   it looks if somebody was a legitimate challenge under Batson

1   out of the -- her demeanor during the statement of charges,

2   one might have expected questions to have been asked about

3   that.

4           No questions were asked about glasses, whether

5   they were prescription or not.  Whether she'd be willing to

6   take them off.  There was no reason that we couldn't simply

7   couldn't request her to remove them if somehow her wearing

8   glasses were a concern.

9           And the fact that that was not done again suggests

10  to me that the concern that is being raised about her

11  glasses is a function of their esthetics and their

12  appearance which means that is not a racially neutral

13  explanation.

14          I think the Court understands my position.

15          THE COURT:  I do.

16          Does the government have anything further to say

17  in response to Ms. Durie's comments.

18          MR. MORSE:  I would add, Your Honor, is if we had

19  questioned her, then counsel would be using that as a reason

20  to support her Batson Wheeler challenge.

21          So I mean, we made the observations that we made

22  and we exercised a peremptory challenge for the reasons that

23  we've stated and they were race neutral.

24          I'll submit on that.

25          THE COURT:  All right.  The Court finds the

```
1   reasons offered by the government to be credible.  I did not

2   personally observe that particular juror sitting out in the

3   audience so I can't say one way or the other.

4          But I have no reason to discredit the statements

5   of two prosecutors of what they observed.  The other

6   explanations were case specific and at this point I have no

7   reason to find them to be pretextural and, in fact, I -- I

8   say I agree with all of them.  I don't need to agree with

9   all of them but they certainly were based on factors in the

10  case, questions that even some of them the defense had

11  thought were important enough to be asked, and they were all

12  legitimate questions.

13         The motion is denied.

14         When we come back, I will excuse Juror No. 1 and

15  then we will proceed with jury selection.

16         The government will then have a -- you probably

17  don't want to exercise any other challenges until you know

18  who will be in seat No. 1.

19         MR. GONZALEZ:  Yes, Your Honor.  We'd like to see

20  who the new Juror No. 1 is.

21         THE COURT:  Okay.  So then we will just go on from

22  there.

23         MS. DOTSON:  Your Honor, regarding the jury

24  information, may I ask this be left in the courtroom?

25         THE COURT:  I have already ordered that they are
```

**CERTIFICATE**

      I, PAT CUNEO, CSR 1600, hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 7, 2023

      /s/ _____

      PAT CUNEO, OFFICIAL REPORTER
      CSR NO. 1600

411

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                     WESTERN DIVISION

4        THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,        )
                                     )
7                     Plaintiff,     )
                                     )
8            vs.                     ) NO. CR 21-485-DSF
                                     )
9   MARK RIDLEY-THOMAS,              )
                                     )
10                    Defendant.     )
    _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16               Los Angeles, California

17          Wednesday, March 8, 2023, 12:14 P.M.

18

19      Day 2 of Jury Trial, Page 411 to 511, Inclusive

20

21                              WIL WILCOX, CSR 9178
                                Official Reporter
22                              First Street Courthouse
                                350 West 1st Street
23                              Room 4311
                                Los Angeles, CA 90012
24                              wil.wilcox@gmail.com

25

1    vague, "knowing what you know now."

2            THE COURT:  I guess that's right.  We don't know

3    everything that you're referring to.

4    BY MS. DOTSON:

5    Q.   Dr. Clapp, if you had known that there was an email to

6    Marilyn Flynn telling her that the head of the Department of

7    Mental Health was ready to go at the same time Marilyn Flynn

8    is trying get a contract with the Department of Mental

9    Health and the person sending her this email is the father

10   of Sebastian Ridley-Thomas, would you have wanted to know

11   that fact before you then are expediting all of those

12   benefits we had talked about for Sebastian Ridley-Thomas?

13           MR. GONZALEZ:  I'm sorry, Your Honor.  It's

14   argument.  It also mischaracterizes with the document says.

15           THE COURT:  Sustained.

16   BY MS. DOTSON:

17   Q.   Would you have had wanted to know before you expedited

18   any benefit for Sebastian Ridley-Thomas, whether there had

19   been any agreement between Mark Ridley-Thomas and Marilyn

20   Flynn related to county business?

21   A.   Yes.

22   Q.   Why would you have wanted to know that before you went

23   to work providing these benefits for Sebastian

24   Ridley-Thomas?

25   A.   I would have been concerned that it was a potential

461

1    conflict of interest.

2            MS. DOTSON:  If we could publish Exhibit 41.

3    There's no objection from the defense.

4    Q.   Dr. Clapp, have you seen Exhibit 41 before?

5            We can zoom in a little bit.

6    A.   Yes, I have.

7    Q.   What is Exhibit 41?

8    A.   This is an email from myself to Marilyn Flynn, June

9    Wiley, Leslie Wind, Sebastian Ridley-Thomas and

10   Carmen Frierson, in response to the earlier emails of that

11   same day, December 14th, 2017.

12   Q.   Is it in response to the emails where Marilyn Flynn

13   was asking you for that scholarship award for Sebastian

14   Ridley-Thomas?

15   A.   Yes.

16   Q.   Do you see here where you write, "I have instructed

17   Janine and her team to arrange the scholarship and a Dean's

18   Leadership Award"; do you see that?

19   A.   Yes.

20   Q.   Who is Janine?

21   A.   Janine, at the time, was the head of our marketing and

22   outreach that was in the student admissions branch.  And she

23   would have been over the whole scholarship team for the MSW

24   program.

25   Q.   What is the Dean's Leadership Award?

```
 1                         CERTIFICATE

 2

 3          I, WIL S. WILCOX, CSR 9178, hereby certify that

 4    pursuant to Section 753, Title 28, United States Code, the

 5    foregoing is a true and correct transcript of the

 6    stenographically reported proceedings held in the

 7    above-entitled matter and that the transcript page format is

 8    in conformance with the regulations of the Judicial

 9    Conference of the United States.

10
      Date:  March 13, 2023
11

12

13

14

15                           /s/_____

16                           WIL S. WILCOX, OFFICIAL REPORTER
                             CSR NO. 9178
17

18

19

20

21

22

23

24

25
```

512

```
 1                  UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                       WESTERN DIVISION

 4         THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6   UNITED STATES OF AMERICA,         )
                                       )
 7                     Plaintiff,      )
                                       )
 8            vs.                      ) NO. CR 21-485-DSF
                                       )
 9   MARK RIDLEY-THOMAS,               )
                                       )
10                     Defendant.      )
     _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16                  Los Angeles, California

17            Thursday, March 9, 2023, 7:44 A.M.

18

19       Day 3 of Jury Trial, Page 512 to ***, Inclusive

20

21                                 PAT CUNEO CSR 1600
22                                 Official Reporter
                                   First Street Courthouse
23                                 350 West 1st Street
                                   Room 4311
24                                 Los Angeles, CA 90012
                                   213-894-1782
25                                 patcuneo1600@gmail.com
                                   www.patcuneo.com
```

```
 1   wasn't any concerns happening.
 2           And employees at Price or the School of Social
 3   Work expressing concern, sending a flurry of emails around
 4   about this topic goes to rebut the defense that this was
 5   business as usual and making statements at that time.
 6           The reason we are calling the witnesses
 7   themselves, because they will testify about the truth that
 8   they had these concerns, that they sent these emails.
 9           And then the emails themselves come in not for the
10   truth but to corroborate that they did, in fact, make
11   statements --
12           THE COURT:  What is this corroboration?  That
13   doesn't make any sense at all.
14           MS. DOTSON:  It's a contemporaneous statement --
15           THE COURT:  Why are you trying to build error into
16   this case?
17           MS. DOTSON:  We are not, Your Honor.
18           THE COURT:  Well, you're working on it.
19           So we'll take out that top part.  You have
20   witnesses who are going to testify to that.
21           MR. MORSE:  Just for clarification, is the Court
22   referring to the message from Kattie Johnson to Mike Nichol
23   at the very top?
24           THE COURT:  And Mike Nichol to Kattie.  You can
25   take -- do you want to take out the "Even worse than we
```

*Day 3 of Jury Trial, March 9, 2023, AM Session*

1   suggests that the money's supposed to come in and go right
2   out the door to Sebastian Ridley-Thomas?
3   A.   I do not.
4   Q.   Did Marilyn Flynn ever tell you that this money was
5   supposed to be funneled through USC to the school -- from
6   the School of Social Work through USC and out to a nonprofit
7   controlled by the defendant's son?
8           MR. GONZALEZ:  Your Honor, I object.  It's
9   argumentative.
10          THE COURT:  Overruled.
11  BY MS. DOTSON:
12  Q.   I'll ask it again, Dr. Clapp.  Did Marilyn Flynn ever
13  tell you that an incoming 100,000-dollar payment on
14  May 2nd, 2018, to the School of Social Work was supposed
15  to be funneled through the university and go out just days
16  later to a nonprofit controlled by the defendant's son?
17  A.   She did not, no.
18  Q.   If this hundred thousand-dollar payment from the
19  defendant's Ballot Committee had intended to be routed
20  through the School of Social Work and out to a nonprofit
21  controlled by the defendant's son, if that were true and if
22  you had learned about it at this time, what would you have
23  done?
24  A.   I -- well, at first I would have asked Marilyn why we
25  were doing that and if it was legitimate and perhaps maybe

```
 1                          CERTIFICATE

 2

 3          I, PAT CUNEO, CSR 1600, hereby certify that

 4   pursuant to Section 753, Title 28, United States Code, the

 5   foregoing is a true and correct transcript of the

 6   stenographically reported proceedings held in the

 7   above-entitled matter and that the transcript page format is

 8   in conformance with the regulations of the Judicial

 9   Conference of the United States.

10
     Date:  March 9, 2023
11

12

13

14

15                              /s/_____

16                              PAT CUNEO, OFFICIAL REPORTER
                                CSR NO. 1600
17

18

19

20

21

22

23

24

25
```

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4       THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,          )
                                       )
7                   Plaintiff,         )
                                       )
8           vs.                        ) NO. CR 21-485-DSF
                                       )
9   MARK RIDLEY-THOMAS,                )
                                       )
10                  Defendant.         )
    _____)

11

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16              Los Angeles, California

17          Friday, March 10, 2023, 7:46 A.M.

18

19      Day 4 of Jury Trial, Page 796 to 936, Inclusive

20

21
                              PAT CUNEO CSR 1600
22                            Official Reporter
                              First Street Courthouse
23                            350 West 1st Street
                              Room 4311
24                            Los Angeles, CA 90012
                              213-894-1782
25                            patcuneo1600@gmail.com
                              www.patcuneo.com

1  employees to feel safe and supported; and that might have

2  been raised as a concern if someone who had sexual

3  harassment allegations against them were hired.  I...

4  Q.  Now, in addition to the concerns you've expressed, did

5  you eventually come to have optics concerns with the hiring

6  of Sebastian Ridley-Thomas as the executive director of

7  AACEP?

8  A.  Yes, but --

9  Q.  Can you explain that?

10  A.  -- it had nothing to do with the sexual harassment

11  allegations, which I did not connect with

12  Sebastian Ridley-Thomas at the time.

13       For me, it was strictly about funds from his

14  father's campaign going to support -- it was more about

15  nepotism, going to support his -- potentially his son's

16  employment.

17  Q.  And what is it -- you mentioned nepotism.  Why would

18  you not want to be seen -- what was your concern with

19  nepotism?

20  A.  Again, I was just doing my job.  These were not my

21  personal rules that I passed upon the whole organization.

22       We wanted to be sure that, umm, we were not seen

23  as doing special favors for special people, even if we

24  really liked them, supported what they were about, were

25  strong believers in the same values as they had.

**CERTIFICATE**

        I, PAT CUNEO, CSR 1600, hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 10, 2023

                              /s/_____

                              PAT CUNEO, OFFICIAL REPORTER
                              CSR NO. 1600

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                       WESTERN DIVISION

 4        THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6   UNITED STATES OF AMERICA,        )
                                      )
 7                   Plaintiff,       )
                                      )
 8          vs.                       ) NO. CR 21-485-DSF
                                      )
 9   MARK RIDLEY-THOMAS,              )
                                      )
10                   Defendant.       )
     _____)
11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16                 Los Angeles, California

17           Wednesday, March 15, 2023, 7:48 A.M.

18

19      Day 6 of Jury Trial, Page 1318 to 1513, Inclusive

20

21                              PAT CUNEO CSR 1600
22                              Official Reporter
                                First Street Courthouse
23                              350 West 1st Street
                                Room 4311
24                              Los Angeles, CA 90012
                                213-894-1782
25                              patcuneo1600@gmail.com
                                www.patcuneo.com
```

1363

1   Q.   Did you find out that that person was

2   Mark Ridley-Thomas's son?

3   A.   Yes.

4   Q.   Did you know that when you were attempting to process

5   this check?

6   A.   No.  I had no idea, no.

7   Q.   If you had known that information, would you have

8   handled this differently?

9   A.   Yeah.  Yes.

10  Q.   Why do you say that?

11  A.   Because, umm, that -- I -- I really value my job.  It's

12  my livelihood.  I -- if I would have done something like

13  that, I could've lost my job and I worked really hard to get

14  where I am.

15            MS. DURIE:  Your Honor, I move to strike the

16  comment as being -- lacking foundation, being speculative.

17            THE COURT:  That will be stricken.

18  BY MR. MORSE:

19  Q.   Well, let me ask you this, Ms. Gonzalez:  If you were

20  to have placed incorrect information, if you tried to

21  mislead the disbursement control department, for example, as

22  to the true purpose of that hundred-thousand-dollar payment,

23  could that have resulted in disciplinary action for you?

24            MS. DURIE:  Objection.  Lacks foundation, calls

25  for --

*Day 6 of Jury Trial, March 15, 2023, A.M. Session*

1    A.    Because in our initial -- the initial information we

2    were provided by USC was that a hundred-thousand-dollar

3    check had been sent to United Ways of California.

4    Q.    Have you reviewed Government Exhibits 401 through 436?

5    A.    Yes.

6    Q.    Are those all records that you received from United

7    Ways of California?

8    A.    Yes.

9    Q.    Now, Agent Adkins, did there come a point in time in

10   your investigation when you learned about an attempted a

11   hundred-thousand-dollar donation five months prior to the

12   one that went to United Ways of California?

13   A.    Yes.

14   Q.    And who was that attempted hundred-thousand-dollar

15   donation to?

16   A.    It was an attempt from the Mark Ridley-Thomas Committee

17   for a Better L.A. to send a hundred thousand dollars to

18   Community Partners.

19   Q.    Is that the one we heard about from Paul Vandeventer

20   and Sheri Dunn Berry that was eventually refunded --

21   A.    Yes.

22   Q.    -- due to optics?

23   A.    Yes.

24   Q.    Okay.  Did you issue a subpoena to Community Partners

25   for records regarding the attempted -- the first

1513

## CERTIFICATE

I, PAT CUNEO, CSR 1600, hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 15, 2023

/s/_____

PAT CUNEO, OFFICIAL REPORTER
CSR NO. 1600

1514

1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA

3     WESTERN DIVISION

4     THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6     UNITED STATES OF AMERICA,            )
                                           )
7                        Plaintiff,        )
                                           )
8            vs.                           ) NO. CR 21-485-DSF
                                           )
9     MARK RIDLEY-THOMAS,                  )
                                           )
10                       Defendant.        )
      _____ )

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16               Los Angeles, California

17          Tuesday, March 15, 2023, 11:28 A.M.

18

19     Day 6 of Jury Trial, Page 1514 to 1624, Inclusive

20

21

22                              WIL WILCOX, CSR 9178
                                Official Reporter
23                              First Street Courthouse
                                350 West 1st Street
24                              Room 4311
                                Los Angeles, CA 90012
25                              wil.wilcox@gmail.com

1562

1  written offer, which will go -- which we will get to you

2  shortly."

3  Q.   At the same time, zooming back out, is there

4  another email about Sebastian Ridley-Thomas's financial

5  condition on January 18th, 2018?  Do you see that at the

6  bottom there?

7  A.   Yes.

8  Q.   Is this one of the emails where Sebastian Ridley-Thomas

9  appears to be asking his father for a loan?

10 A.   Yes.

11       MS. DOTSON:   Okay.   Zoom back out.

12 Q.   At this time in January of 2018, are a lot of things

13 happening regarding the $100,000 with Community Partners?

14 A.   Yeah.  It's around this time that Community Partners is

15 debating whether or not to retain that $100,000 due to

16 optics.

17 Q.   At the end of January 2018, is that $100,000 ultimately

18 refunded, like we heard from Paul Vandeventer and

19 Sheri Dunn Berry?

20 A.   Yes.

21       MS. DOTSON:   Let's go to Page 32 of Exhibit 787.

22 Q.   Throughout this time in January also, are there

23 just a number of emails going back and forth with the

24 Defendant, updating Sebastian Ridley-Thomas's resume and

25 talking about all the different kind of jobs he's going to

1624

**CERTIFICATE**

        I, WIL S. WILCOX, CSR 9178, hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 16, 2023


                          /s/_____

                          WIL S. WILCOX, OFFICIAL REPORTER
                          CSR NO. 9178

1625

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    WESTERN DIVISION

4    THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6    UNITED STATES OF AMERICA,          )
                                        )
7                    Plaintiff,         )
                                        )
8          vs.                          ) NO. CR 21-485-DSF
                                        )
9    MARK RIDLEY-THOMAS,                )
                                        )
10                   Defendant.         )
     _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16              Los Angeles, California

17         Thursday, March 16, 2023, 7:44 A.M.

18

19    Day 7 of Jury Trial, Page 1625 to 1776, Inclusive

20

21                              PAT CUNEO CSR 1600
22                              Official Reporter
                                First Street Courthouse
23                              350 West 1st Street
                                Room 4311
24                              Los Angeles, CA 90012
                                213-894-1782
25                              patcuneo1600@gmail.com
                                www.patcuneo.com

1  someone in an investigation is a cost benefit analysis; is

2  that right?

3  A.   That's correct.

4  Q.   So let's start by talking about the benefit side of

5  the equation.  So the benefit of talking to

6  Supervisor Ridley-Thomas's deputies would have been that you

7  might have learned why Supervisor Ridley-Thomas had

8  supported these particular agenda items; right?

9        MS. DOTSON:  Objection.  Speculation.

10        THE COURT:  If you can answer.  Don't guess.  If

11  you can answer based on your investigation.

12        THE WITNESS:  Can you repeat the question?  Sorry.

13  BY MS. DURIE:

14  Q.   Sure.

15        If you -- one of the benefits when you were

16  thinking about the cost benefit of whether to talk to

17  Mark Ridley-Thomas's deputies or not, one thing on the

18  benefit side of the equation would be the opportunity to

19  learn why he supported those agenda items; right?

20  A.   I don't know that that bene- -- that I assessed that as

21  a benefit because that was known to me at the time.

22  Q.   Oh, so you knew from your investigation why

23  Mark Ridley-Thomas had supported each of these agenda items?

24  A.   Generally speaking, I knew that he supported the

25  substance of these agenda items.

1  Q.   And you knew why?

2  A.   I -- I think it was because he supported them in -- in

3  theory.

4  Q.   When you say "he supported them in theory," you mean

5  because they were consistent with his legislative agenda?

6  A.   I would agree with that.

7  Q.   Okay.  So to be clear, each of the agenda items that my

8  client is accused of corruptly supporting in this case are

9  agenda items that were consistent with his legislative

10  agenda?

11  A.   Yes.

12  Q.   Okay.  Now, was one of the benefits of talking to

13  Mark Ridley-Thomas's deputies that you thought about, that

14  you might've learned whether any of these agenda items were

15  controversial?

16  A.   I -- I don't think so.  Can you -- I'm sorry, can you

17  repeat the question?

18  Q.   Well, in your investigation as to whether

19  Mark Ridley-Thomas's support of these agenda items was

20  corrupt, did you want to know whether any of them were

21  remotely controversial?

22  A.   I hadn't thought about that, the controversial aspect

23  of these agenda items.

24  Q.   Did you want to know whether he expressed any unusual

25  interest in any of these agenda items?

1776

## CERTIFICATE

I, PAT CUNEO, CSR 1600, hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: _____

/s/ _____

PAT CUNEO, OFFICIAL REPORTER
CSR NO. 1600

1777

1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4     THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,        )
                                     )
7                   Plaintiff,       )
                                     )
8          vs.                       ) NO. CR 21-485-DSF
                                     )
9   MARK RIDLEY-THOMAS,              )
                                     )
10                  Defendant.       )
    ─────────────────────────────────)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16            Los Angeles, California

17        Thursday, March 16, 2023, 11:28 A.M.

18

19    Day 7 of Jury Trial, Page 1777 to 1891, Inclusive

20

21

22                          WIL WILCOX, CSR 9178
                            Official Reporter
23                          First Street Courthouse
                            350 West 1st Street
24                          Room 4311
                            Los Angeles, CA 90012
25                          wil.wilcox@gmail.com

1  to the Blue Ribbon Commission under "Justifications" for why

2  one would want to extend this contract?

3  A.    No.

4  Q.    You didn't ask him that?

5  A.    I don't recall if we discussed the Blue Ribbon

6  Commission during my interview with him.

7  Q.    Now, if we continue reading the justification, it says,

8  The Blue Ribbon Commission, directed by a motion from your

9  Board in August of 2013, articulated a countywide mission to

10 prioritize and address child safety issues.  The USC

11 Telehealth program aligns with the Blue Ribbon Commission's

12 recommendations for a safety system that supports

13 trauma-focused assessment and interventions and delivery of

14 critical mental health services to children and transitional

15 age youths.

16        Now, in the course of your investigation, did you

17 uncover any evidence that the -- that John Sherin's

18 recitation of the justifications for the contract extension

19 were not genuine?

20 A.    Yes.

21 Q.    By Dr. Sherin?

22 A.    Yes.

23 Q.    Is that what you believe Dr. Sherin -- is that --

24 strike that.

25        Is that based on something Dr. Sherin told you?

1   A.   That was based on my interview of Dr. Sherin.

2   Q.   All right.  Now, in this notice of intent, you see

3   there is a reference, if we go a little bit further down --

4   well, strike that.  This is 1066.  Well, strike that.

5          MS. DURIE:  Let me have Exhibit 1066.  Up.  There

6   we go.

7   BY MS. DURIE:

8   Q.   Exhibit 1066 is a December 23rd, 2015 notification of

9   intent to enter into a sole source contract negotiation,

10  right?

11  A.   I'm sorry, what -- what exhibit?  Do I have that?

12  Q.   Sorry.  That was terrible.  I apologize.

13         MS. DURIE:  DTX-1066 is a notification of intent

14  to enter into a sole source contract negotiation.  We offer

15  it.

16         MS. DOTSON:  Your Honor, we don't object --

17         THE WITNESS:  Do I --

18         MS. DOTSON:  -- to 1066.  We don't object.

19         THE COURT:  Okay.  That's admitted.

20         (Exhibit DTX-1066 received in evidence.)

21  BY MS. DURIE:

22  Q.   Now, if we take a look at 1066, we are now at

23  December 23rd of 2015, right?

24  A.   Yes.

25  Q.   This is the notification of intent to enter into the

1    original telehealth contract, right?

2    A.    Yes.   That's what it -- that's what it appears to be.

3    Q.    Is this one of the documents that you were reviewed in

4    your investigation?

5    A.    I don't recall.

6    Q.    Okay.   And if we look at the second paragraph, it again

7    talks about the Blue Ribbon Commission.   Do you see that?

8    A.    Yes.

9    Q.    And it says about four lines down in the second

10   paragraph, The Blue Ribbon Commission issued a set of

11   recommendations, including articulating a country -- a

12   countywide mission to prioritize and improve child safety.

13           Do you see that?

14   A.    Yes.

15   Q.    And then continuing, it says, On July 28th, 2015,

16   following consultation with Supervisorial District 2 and

17   senior leadership at the Department of Mental Health,

18   Department of Children and Family Services, and Department

19   of Health Services, USC submitted a project proposal to the

20   department of mental health to provide innovative telemental

21   health services, et cetera.

22           That is the origin of the telehealth contract,

23   right?

24   A.    Yes.

25   Q.    And that justification that we see here for the

1797

1    A.    Thank you.  Oh, okay.

2    Q.    Now, let me just ask you -- you can set that to one

3    side.

4    A.    Uh-huh.

5    Q.    Did you learn in the course of your investigation that

6    there was a board of councilors meeting of the USC School of

7    Social Work that took place in February 2015?

8    A.    Yes.  I would have reviewed that.

9    Q.    And did you learn that Mark Ridley-Thomas was one of

10   the speakers at that meeting?

11   A.    It appears so.

12            MS. DURIE:  We offer DTX-1045.

13            MS. DOTSON:  Objection.  Hearsay.

14            THE COURT:  Sustained.

15            MS. DURIE:  If we could put up DTX-1066 in

16   evidence.

17   BY MS. DURIE:

18   Q.    DTX-1026 is a notification of an intent to enter into a

19   sole source contract negotiation from December 23rd of 2015.

20   We looked at this few moments ago, right?

21   A.    Yeah.  I believe you said 10 -- this is 1066.

22   Q.    1066.  I apologize if I misspoke.  That's right.

23            And we said this was the original telehealth

24   contract, right?

25   A.    Yes.

1   telehealth contract, right?

2   A.   Yes, he did.

3   Q.   In fact, it was approved by a unanimous vote, right?

4   A.   Yes.  It may have been on consent.  I don't know.

5   Q.   Fair enough.  Nobody was against it?

6   A.   It doesn't appear so.

7   Q.   And in fact, Mark Ridley-Thomas publicized his support

8   for this partnership with USC as one of his accomplishments,

9   right?

10  A.   He may have.

11  Q.   DTX -- oh, and that's actually a -- that's -- my

12  partner had a very good point.

13           Looking at what's up on the screen --

14  A.   Uh-huh.

15  Q.   -- this original telehealth contract, it was a motion

16  by Supervisor Kuehl, seconded by Supervisor Solis, right?

17  A.   Correct.

18           MS. DURIE:  Okay.  Now, DTX-1078 is a press

19  release by Supervisor Mark Ridley-Thomas pertaining to the

20  telehealth contract.  We offer it.

21           MS. DOTSON:  Objection.  Hearsay.

22           MS. DURIE:  The Court ruled on this.

23           THE COURT:  It's admitted.

24  BY MS. DURIE:

25  Q.   And we can take a look at DTX-1078, this is a press

1    A.   Yes.

2    Q.   And it passed with a 5/0 vote, right?

3    A.   Yes.

4    Q.   It was also on the consent calendar?

5    A.   It may have been.

6    Q.   Now, you're not saying that a person would have to be

7    corrupt in order to support this extension of the telehealth

8    contract, are you?

9    A.   No.

10   Q.   Okay.  Did you find any evidence that

11  Mark Ridley-Thomas had not supported USC's

12  telehealth program from the very beginning?

13  A.   The evidence that we found seemed to indicate that he

14  didn't support -- well, rephrase the question again.  I'm

15  sorry.  Ask the question.

16  Q.   Sure.

17        Did you find any evidence that Mark Ridley-Thomas

18  had not supported USC's telehealth program from the very

19  beginning?

20  A.   No.

21  Q.   Did you find evidence that Mark Ridley-Thomas had ever

22  at any point from 2014 to 2018 voiced opposition to USC's

23  telehealth program?

24  A.   No.

25  Q.   Now, we've talked a bunch about this hand-delivered

```
 1                          CERTIFICATE

 2

 3           I, WIL S. WILCOX, CSR 9178, hereby certify that

 4    pursuant to Section 753, Title 28, United States Code, the

 5    foregoing is a true and correct transcript of the

 6    stenographically reported proceedings held in the

 7    above-entitled matter and that the transcript page format

 8    is in conformance with the regulations of the Judicial

 9    Conference of the United States.

10
      Date:  March 17, 2023
11

12

13

14

15                              /s/_____

16                              WIL S. WILCOX, OFFICIAL REPORTER
                                CSR NO. 9178
17

18

19

20

21

22

23

24

25
```

1892

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    WESTERN DIVISION

4    THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6    UNITED STATES OF AMERICA,            )
                                          )
7                      Plaintiff,         )
                                          )
8            vs.                          ) NO. CR 21-485-DSF
                                          )
9    MARK RIDLEY-THOMAS,                  )
                                          )
10                     Defendant.         )
     _____ )

11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16                  Los Angeles, California

17             Friday, March 17, 2023, 7:44 A.M.

18

19       Day 8 of Jury Trial, Page 1892 to 2044, Inclusive

20

21                                  PAT CUNEO CSR 1600
22                                  Official Reporter
                                    First Street Courthouse
23                                  350 West 1st Street
                                    Room 4311
24                                  Los Angeles, CA 90012
                                    213-894-1782
25                                  patcuneo1600@gmail.com
                                    www.patcuneo.com

1   THE COURT:  Sustained.

2   MS. DURIE:  Well, Your Honor, there was direct --

3   THE COURT:  No.  We've gone over this numerous

4   times.  Ask another question.

5   BY MS. DURIE:

6   Q.  Did you see any document in which Mark Ridley-Thomas or

7   his staff threatened to -- and I think this was the word

8   used in your redirect -- cancel any contract?

9   MS. DOTSON:  Objection.  Outside the scope.

10  MS. DURIE:  That was the word used in the

11  question, "threats to cancel the question."

12  THE COURT:  Just answer the question.

13  And then move on.

14  Go ahead.

15  THE WITNESS:  I believe that point in my

16  testimony, I was describing general powers that the Board of

17  Supervisors has.

18  BY MS. DURIE:

19  Q.  Right.  In connection with the facts of this case, did

20  you see any evidence that Mark Ridley-Thomas or his staff

21  threatened to cancel or rescind any contract?

22  A.  That was brought up during interviews that we

23  conducted.

24  Q.  Did you see any documents in which Mark Ridley-Thomas

25  or his staff --

2024

```
 1   Social Work - congratulations to you!  In case USC wants to
 2   send funds directly, I have attached our bank wiring
 3   instructions along with the IRS Exemption Letter for your
 4   review."
 5           Is that the similar email that you sent on April
 6   27th, 2018, to Sebastian Ridley-Thomas?  You see at the
 7   bottom your name, "Kindest regards"?
 8   A.   Yes.
 9           MR. RYBARCZYK:  Let's go to the top again.
10           (The exhibit was displayed on the screen.)
11   BY MR. RYBARCZYK:
12   Q.   Do you see here Mark Ridley-Thomas writes:  "Attached
13   is the information you requested.  At this point it is
14   necessary to act with dispatch so as to facilitate the
15   completion of Ms. Smith's on-boarding with United Way in a
16   timely manner - no later than May 15th"?
17           Now, when you spoke to Ms. Flynn on May 4th,
18   2018, did she tell you anything about Zaneta Smith?
19   A.   No, she didn't.
20   Q.   Did she tell you anything about onboarding an employee?
21   A.   No, she didn't.
22   Q.   Had you known that the hundred thousand dollars coming
23   from USC was actually to onboard an employee as opposed to a
24   sponsorship for a survey, would you have put that in your
25   invoice?
```

1  A.   If it was understood to me that I was asked to deliver

2  false information, then, no, I would not have created an

3  invoice.

4  Q.   Why not?

5  A.   Because I don't believe that would be ethical or legal.

6          MR. RYBARCZYK:  No further questions at this time,

7  Your Honor.

8          THE COURT:  Cross-examination?

9                    **CROSS-EXAMINATION**

10 BY MS. LANIER:

11 Q.   Good morning, Ms. McMahon.

12 A.   Good morning.

13 Q.   You've spoken to the government three times before your

14 testimony today; right?

15 A.   Yes, that's correct.

16 Q.   You spoke with them for the first time in late August

17 of 2018.  Does that sound right?

18 A.   That sounds correct, yes.

19 Q.   And then the second time you met with them was in

20 February of this year; right?

21 A.   I believe, yes, last month.

22 Q.   And then the third time was about a week ago; right?

23 A.   Yes, that is correct.

24 Q.   And you've testified today that your job at United Ways

25 in 2018 was as a program assistant?

1
**CERTIFICATE**

2

3          I, PAT CUNEO, CSR 1600, hereby certify that

4  pursuant to Section 753, Title 28, United States Code, the

5  foregoing is a true and correct transcript of the

6  stenographically reported proceedings held in the

7  above-entitled matter and that the transcript page format is

8  in conformance with the regulations of the Judicial

9  Conference of the United States.

10
Date:  March 17, 2023

11

12

13

14

15                              /s/_____

16                              PAT CUNEO, OFFICIAL REPORTER
                                CSR NO. 1600
17

18

19

20

21

22

23

24

25

2047

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                      WESTERN DIVISION

 4       THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6   UNITED STATES OF AMERICA,        )
                                      )
 7                    Plaintiff,      )
                                      )
 8            vs.                     ) NO. CR 21-485-DSF
                                      )
 9   MARK RIDLEY-THOMAS,              )
                                      )
10                    Defendant.      )
     _____)

11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16                 Los Angeles, California

17           Friday, March 17, 2023, 11:51 A.M.

18

19      Day 8 of Jury Trial, Page 2047 to 2117, Inclusive

20

21

22                              WIL WILCOX, CSR 9178
                                Official Reporter
23                              First Street Courthouse
                                350 West 1st Street
24                              Room 4311
                                Los Angeles, CA 90012
25                              wil.wilcox@gmail.com
```

1    BY MR. RYBARCZYK:

2    Q.   Now, during that same conversation with

3    Mr. Vandeventer, did he tell you that Community Partners

4    had received a 100,000-dollar donation from Mark

5    Ridley-Thomas' ballot committee, the Mark Ridley-Thomas

6    Committee For A Better L.A. in December 2017?

7    A.   No.

8    Q.   During that same conversation with Mr. Vandeventer, did

9    he tell you that Community Partners returned the

10   100,000-dollar donation when it told Mark Ridley-Thomas that

11   it would not be taking on Sebastian Ridley-Thomas as AACEP's

12   executive director?

13   A.   No.

14   Q.   Would that have been something you'd at least wanted to

15   know at the time when evaluating whether to bring on PRPI as

16   a fiscal sponsor?

17   A.   Yes.  That would have been good context.

18   Q.   Why?

19   A.   Well, we were just trying to figure out what -- you

20   know, is this a project that fits our mission and that also

21   is going to do real work, right?  And if he had concerns --

22   if Paul had about that, I would want to know.

23   Q.   What about if Community Partners had concerns,

24   generally, or that --

25   A.   Yeah, that would be good to know.  It would, yes, good

```
 1   BY MR. RYBARCZYK:

 2   Q.   Is that four?  Is that accurate?  Okay.

 3            Now, in the four emails that Mark Ridley-Thomas

 4   sent you and his voice mail and during your conversation

 5   with him on May 4th, did Mark Ridley-Thomas tell you that he

 6   had just donated $100,000 from his ballot committee, the

 7   Mark Ridley-Thomas Committee For A Better L.A., to USC?

 8   A.   No.

 9   Q.   Now, in those same conversations and emails, did

10   Mark Ridley-Thomas tell you that shortly thereafter, he

11   directed USC to make 100,000-dollar donation to United Ways

12   for PRPI?

13   A.   No.

14            MS. AMRAM:  Objection.  Lacks foundation, assumes

15   facts not in evidence.

16            THE COURT:  Overruled.

17            THE WITNESS:  No.

18   BY MR. RYBARCZYK:

19   Q.   No, okay.

20            Given the importance of knowing the source of the

21   funds you just testified to, would you have at least wanted

22   to know the fact that the money that Mark Ridley-Thomas had

23   paid to USC the $100,000 was from his ballot committee and

24   that USC had turned around and donated $100,000 to PRPI?

25   A.   It would've been good to know, yes.
```

1   wrote, it was like, okay, let's just take a pause.  So

2   that's what we ended up doing.

3   Q.   Now, in August 2018, did you tell

4   Sebastian Ridley-Thomas that you would have to

5   terminate Zaneta Smith if you did not receive

6   additional funds?

7   A.   Yes.  We were having conversations about -- they had

8   other funds available and so we were going to use those

9   other to keep Zaneta on, Ms. Smith on, and -- but those

10  funds will run out if we don't get additional funds.  And we

11  were talking about, you know, his prospects for lining up

12  additional support.

13  Q.   Did you -- shortly after this situation, however, did

14  PRPI move on from United Ways?

15  A.   Yes.

16  Q.   Now, in all your conversations with

17  Sebastian Ridley-Thomas, did he ever tell you that just

18  mere days before the 100,000-dollar payment to United Ways,

19  if Mark Ridley-Thomas' ballot committee had given a

20  100,000-dollar payment to USC?

21  A.   No.

22  Q.   Now, did -- in all the conversations you had and emails

23  you had with Mark Ridley-Thomas, did Mark Ridley-Thomas ever

24  tell you, in the days -- the mere days leading up to the --

25  to May 4th, 2018, his ballot committee had provided $100,000

2110

1    to USC?

2    A.    No.

3    Q.    Now, did Sebastian Ridley-Thomas ever tell you, in all

4    your conversations with him, if the 100,000-dollar payment

5    from USC to United Ways had been directed by his father,

6    Mark Ridley-Thomas?

7                MS. AMRAM:  Objection.  Foundation.

8                THE COURT:  No.  Overruled.

9                THE WITNESS:  Can you repeat the question --

10   BY MR. RYBARCZYK:

11   Q.    Sure.

12   A.    -- real quick?

13   Q.    In all your conversations with Sebastian Ridley-Thomas,

14   did he ever tell you that his father, Mark Ridley-Thomas,

15   had directed the 100,000-dollar payment from USC to United

16   Ways for PRPI?

17               THE COURT:  That was not the question you asked.

18               THE WITNESS:  Yeah, sorry.

19               MR. RYBARCZYK:  Okay.  Do you want to restate it?

20   Do you want to restate it again, Your Honor?

21               THE COURT:  No.  I want you to ask the question

22   that you asked, which is the question to which I overruled

23   the objection.

24   BY MR. RYBARCZYK:

25   Q.    In all your convers- -- in all your conversations with

1  Sebastian Ridley-Thomas, did he ever tell you that the

2  100,000-dollar payment from USC to United Ways for PRPI was

3  directed by his father, Mark Ridley-Thomas?

4  A.   No.

5  Q.   Did Mark Ridley-Thom- -- in all the conversations

6  you had with Mark Ridley-Thomas, did he ever tell you

7  that the $100,000 from USC that went to fund PRPI and

8  United Way -- via United Ways was directed by him?

9           MS. AMRAM:  Objection.

10          THE WITNESS:  No.

11          MS. AMRAM:  Assumes facts and foundation.

12          THE COURT:  Overruled.

13          THE WITNESS:  No.

14          MR. RYBARCZYK:  Nothing further, Your Honor.

15          THE COURT:  Cross-examination?

16          MS. AMRAM:  Your Honor, we have no questions.

17          THE WITNESS:  May the witness be excused?

18          MS. AMRAM:  Yes, he may.

19          THE COURT:  Thank you very much, sir.  You're

20  excused.

21          Does the government have any further witnesses?

22          MS. DOTSON:  Your Honor, subject to the government

23  conferring with the Court regarding all the admitted

24  exhibits and all of the exhibits that we understand have

25  been admitted and conferring regarding the matter at

2116

| | |
|---|---|
| 1 | **CERTIFICATE** |
| 2 | |
| 3 | I, WIL S. WILCOX, CSR 9178, hereby certify that |
| 4 | pursuant to Section 753, Title 28, United States Code, the |
| 5 | foregoing is a true and correct transcript of the |
| 6 | stenographically reported proceedings held in the |
| 7 | above-entitled matter and that the transcript page format |
| 8 | is in conformance with the regulations of the Judicial |
| 9 | Conference of the United States. |
| 10 | |
| | Date:  March 18, 2023 |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | /s/_____ |
| 16 | **WIL S. WILCOX, OFFICIAL REPORTER** |
| 17 | **CSR NO. 9178** |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                          WESTERN DIVISION

4           THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,          )
                                        )
7                       Plaintiff,      )
                                        )
8            vs.                        ) NO. CR 21-485-DSF
                                        )
9   MARK RIDLEY-THOMAS,                 )
                                        )
10                      Defendant.      )
    _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16                  Los Angeles, California

17            Thursday, March 23, 2023, 7:35 A.M.

18

19      Day 11 of Jury Trial, Page 2774 to 2914, Inclusive

20

21                              PAT CUNEO CSR 1600
22                              Official Reporter
                                First Street Courthouse
23                              350 West 1st Street
                                Room 4311
24                              Los Angeles, CA 90012
                                213-894-1782
25                              patcuneo1600@gmail.com
                                www.patcuneo.com

1   the folks around them to support world peace.

2           But what you cannot do, what it is wrong to do,

3   what it is corrupt to do -- and make no mistake about it --

4   what it is illegal to do is put that hand out and make

5   anyone think that they've got to pay to play; that they have

6   to give you or your family member or friend something in

7   connection with that thing you're already going to do.

8           That's a crime.  It's corrupt and it is illegal.

9   Public officials do not get to monetize their public

10  service.

11          Let's talk about honest services mail and wire

12  fraud.  This involves a scheme to deprive the public of its

13  right to defend its honest services as a public official

14  because like I said, public officials owe all of us a right

15  to act in our best interests, in the public's best

16  interests.

17          Taking a bribe is the most fundamental violation

18  of that.  It's a scheme involving a bribe in exchange for an

19  official act.

20          The defendant must have had a fiduciary duty.  The

21  defendant must have acted with the intent to defraud.  And

22  whatever the defendant's act was, must have been material

23  and there must have been, for honest services mail fraud, a

24  mailing, or honest services wire fraud, an interstate wire

25  used to carry out the scheme.

1   official would've -- official act would have happened even

2   without the bribe.

3          Because, again, public officials do not get to

4   monetize their public service.  You do not ever get to go

5   out with your hand out and make people think that something

6   that's already going to happen or you intend to do is in any

7   way connected with somebody having to give you or your

8   family, your friends, or your dog, or whatever, a nice

9   series of benefits and perks.

10          Wrong, corrupt, and illegal.

11          Now, in this case scheme, conspiracy, all of it's

12   is pretty simple.  Marilyn Flynn needed help with

13   L.A. County contracts and influence over departments, and

14   those were the four things that she was able to provide the

15   defendant in exchange to help his son.

16          Now, we're going to talk about the first three

17   there:  The admission, the scholarship, and the paid

18   professorship.  Those things really happened throughout 2017

19   and early 2018.

20          The start.  Now, if you recall, there's a

21   stipulation that says the sexual harassment by

22   Sebastian Ridley-Thomas allegedly occurred in 2016 and early

23   2017.

24          Now, in May of 2017, the defendant starts

25   contacting Marilyn Flynn and the discussions begin about

 1  out to Paul Vandeventer.  He sees an opportunity for his son

 2  to potentially take over AACEP.

 3          But he doesn't tell Paul Vandeventer that yet.  He

 4  reaches out to Paul Vandeventer, makes it sound like he just

 5  wants AACEP's work to get off the ground.  He's bcc'ing his

 6  son in those emails, and he's gives $100,000 to Community

 7  Partners for AACEP.

 8          Then later in December, a few weeks, he reaches

 9  back out to Paul Vandeventer.  Oh, by the way, umm, I think

10  my son should be the director of AACEP, that nonprofit

11  initiative I just gave a hundred thousand dollars to.

12          Red flags.  Not as much for Paul Vandeventer.

13  Paul Vandeventer -- "fan" is probably an understatement of

14  Mark Ridley-Thomas.  I think at one point he said during

15  testimony that even if he had known about the sexual

16  harassment stuff, he still would have hired Sebastian if he

17  could but for all of his staff, you know, raising such a

18  ruckus.  And his organization could've taken the media hit

19  from it.

20          I mean, this is a man who would do almost anything

21  for this man sitting here.  But there were red flags.

22  Remember Sheri Dunn Berry?  She talked about how it just

23  seemed nepotistic.  It put the reputation of the

24  organization -- it wasn't illegal but it just didn't feel

25  right.

1          And so with all that pressure back from his staff,

2     Paul Vandeventer returned the hundred thousand dollars.

3          So a new plan forms.  Defendant and

4     Sebastian Ridley-Thomas abandon their plans with AACEP and

5     Community Partners.

6          PRPI is created and the fiscal sponsor is United

7     Ways of California.  United Ways of California is the fiscal

8     sponsor that involved Pete Manzo and Maryrose McMahon who

9     testified later in the trial.

10          And Pete Manzo has, you know, no preexisting

11     relationship with the defendant, didn't really know him at

12     all.

13          So now we get to the second attempt.  The

14     defendant still needs -- still wants to get a hundred

15     thousand dollars to his son's nonprofit.

16          This time he turns to Marilyn Flynn.  He knows

17     Marilyn Flynn needs things from him.  She jumps too when he

18     comes calling and she will help.

19          May 2nd, 2018, there's that

20     hundred-thousand-dollar donation to Marilyn Flynn and the

21     USC School of Social Work.  Seven days later, there's a

22     lovely hundred-thousand-dollar donation to United Ways and

23     PRPI.

24          There won't be a trace, publicly anyways, that

25     this money was going from the defendant's campaign account

1   to Sebastian Ridley-Thomas.

2           And there are two benefits for this.  So, one,

3   it's always good for a politician to not look nepotistic,

4   not look like he's just giving money to his son.  So that's

5   good.  He won't have to disclose it on his Form 460s.

6           But there's another reason.  He needs this

7   transaction to work, to go through.  And if a man as loyal

8   to the defendant like Paul Vandeventer is returning the

9   hundred thousand dollars and say:  I can't keep your money.

10  I'm sorry, Supervisor.

11          Pete Manzo has no fealty, no loyalty to the

12  defendant.  He's going to do the same thing because he cares

13  about the reputation of his organization as well, United

14  Ways.

15          So all of this is to deceive United Ways just as

16  much as it is to deceive the public, and that's how you do

17  it.  You funnel the money through USC.

18          So early April 2018, let's talk before the money

19  gets funneled.  There's an issue going on with

20  Marilyn Flynn.  Telehealth.

21          Telehealth survival is a priority because here's

22  what's going on.  Remember John Clapp testified telehealth

23  was losing about a million dollars a year.  Significant.

24          There was only one more year to try to get it off

25  the ground, and Marilyn Flynn had kind of a two-prong

1        And one of the things for -- in a scheme to

2   defraud is if your other co-schemers are doing things that

3   are reasonably foreseeable, essentially in furtherance of

4   your scheme or same thing in a conspiracy, you're also

5   liable for it.

6        And it was reasonable that Marilyn Flynn would lie

7   to USC internally to move this money through.

8        There's a lot of concealment.

9        Defendant and Flynn tell no one that this hundred

10  thousand dollars is to be funneled through USC to

11  Sebastian Ridley-Thomas' nonprofit.   No one.

12       Defendant never tells Peter Manzo and that's by

13  design.   He had no idea until the *Los Angeles Times* article

14  ran kind of exposing all of this.

15       Marilyn Flynn doesn't tell her USC staff either.

16  She doesn't say:   Hey, I'm moving this money through.

17  Nothing to see here.   This is normal.   Because it's not.

18       And the defendant publicly discloses only that he

19  made a hundred-thousand-dollar donation to the USC School of

20  Social Work.

21       Now, the defense called an expert who, I guess

22  supposedly said that it's okay under state campaign finance

23  law to make a donation when you're intending to funnel the

24  money and conceal the true source.   Fine.

25       Let's just say that that's accurate.   That seems

1    crazy, but let's go with it.

2             There was a reason that the defendant only

3    publicly discloses this.  He doesn't want anybody to know

4    that the money was routed through USC, and that's why he

5    writes just USC, the School of Social Work here.

6             Look.  The defense in opening and throughout this

7    case wants you to believe there's nothing to see here.  This

8    money was always intended to go through USC and there's some

9    purpose and there's some nothing burger here.

10            Nonsense.  Use your reason and common sense.  You

11   don't lie, you don't conceal and move this money through a

12   university and hide it from everyone if there's nothing to

13   see.

14            The only reason the defense has conceded this

15   point at trial.  Because they have to.  You can't hide from

16   these facts now.  You got the emails.  You got the bank

17   wires.  It is so crystal clear.

18            So what do you do?  You come up with a

19   manufactured defense.  You come up with some reason

20   conceivably why, nothing to see here, we always intended for

21   it.  Nothing.

22            Use your reason and common sense.

23            Now, after this, the defendant delivers.  Votes

24   yes on Item No. 27.  Something he'd put in the works a long

25   time ago.  Marilyn Flynn asked him.

```
 1            There's no question that he acted corruptly,
 2   intending to be influenced or most certainly rewarded in
 3   connection with county business.
 4            There was a scheme for the honest services fraud
 5   to deprive the public of its right to defendant's honest
 6   services because that scheme involved bribery.
 7            It involved bribery in exchange for an official
 8   act.  Those are the votes.  Those are the advising of other
 9   officials.  The defendant's acts were material.  Everything
10   he's doing, it's generating outcomes.
11            Remember, ladies and gentlemen, public officials
12   do not -- do not get to monetize their public service.  It
13   doesn't matter if what they're working on is also good for
14   citizens.  Doesn't matter if they always intend to vote for
15   something or do something.
16            World peace.  You're always going to vote in favor
17   of it, you're always going to ask your deputies to work
18   towards it.  It doesn't matter because the crime is
19   consummated with the handout.
20            You don't, as a public official, get to represent
21   to other people that they've got to pay to play.  It is
22   wrong, it is corrupt, and it is illegal.
23            Ladies and gentlemen, you've sat through this
24   trial, you've reviewed the evidence, you've heard the
25   testimony.
```

2914

**CERTIFICATE**

I, PAT CUNEO, CSR 1600, hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 23, 2023

/s/_____

**PAT CUNEO, OFFICIAL REPORTER**
**CSR NO. 1600**

2915

1           UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4     THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5
   UNITED STATES OF AMERICA,          )
6                                     )
                        Plaintiff,    )
7                                     )
               vs.                    ) NO. CR 21-485-DSF
8                                     )
   MARK RIDLEY-THOMAS,                )
9                                     )
                        Defendant.    )
10   _____ )

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16            Los Angeles, California

17       Thursday, March 23, 2023, 12:17 P.M.

18

19    Day 11 of Jury Trial, Page 2915 to 2991, Inclusive

20

21

22                          WIL WILCOX, CSR 9178
                            Official Reporter
23                          First Street Courthouse
                            350 West 1st Street
24                          Room 4311
                            Los Angeles, CA 90012
25                          wil.wilcox@gmail.com

1    Counsels' arguments, their statements, are not evidence.

2    This PowerPoint, you're not going to get it back in the jury

3    deliberation room.  It's not evidence.  It's to help guide

4    you.

5              Counsel's displaying of what, I guess, was

6    represented as testimony in the form of a transcript, that's

7    not evidence either.

8              You rely on your memory of the testimony, not what

9    counsel put on the screen as to what the testimony was, as

10   to what the testimony was that could be cherry-picked and

11   taken out of context or even be incorrect.  You rely on your

12   memory.

13             MS. DURIE:  Your Honor, I object to the

14   "incorrect" with respect to the final transcript.

15             MR. MORSE:  There was something wrong on the

16   screen.

17             THE COURT:  All right.  Well, the transcript will

18   not be going back to you.  So you'll have to rely on what

19   you've heard in court and what you decide the evidence

20   showed.

21             I think it's a good time to break, Mr. Morse.

22             MR. MORSE:  Thank you, Your Honor.

23             THE COURT:  Ladies and gentlemen, don't talk about

24   the case or form or express any opinions about the case

25   until it's finally submitted to you.  Don't let anyone talk

1    to you about the case.  Don't look at any media or social

2    media about the case.

3           You're ordered to return tomorrow by 8 a.m., and

4    you are ordered to have a good evening.

5           THE CLERK:  All rise.

6               *(The jurors exited the courtroom.)*

7           THE COURT:  Have a seat.

8           There are ways to make arguments that don't border

9    on impugning the character of counsel.  Those are the ways

10   that you may use tomorrow.

11          MR. MORSE:  Thank you, Your Honor.

12          THE COURT:  Anything we need to discuss?

13          MS. DURIE:  No.  Thank you, Your Honor.

14          MS. DOTSON:  Nothing further, Your Honor.  Thank

15   you.

16          THE COURT:  All right.  We'll see you tomorrow by

17   7:45.

18               *(At 2:30 p.m., recess was taken.)*

19                        -oOo-

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3          I, WIL S. WILCOX, CSR 9178, hereby certify that

 4     pursuant to Section 753, Title 28, United States Code, the

 5     foregoing is a true and correct transcript of the

 6     stenographically reported proceedings held in the

 7     above-entitled matter and that the transcript page format

 8     is in conformance with the regulations of the Judicial

 9     Conference of the United States.

10
       Date:  March 24, 2023
11

12

13

14

15                         /s/_____

16                         WIL S. WILCOX, OFFICIAL REPORTER
                           CSR NO. 9178
17

18

19

20

21

22

23

24

25
```

2992

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4      THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5
   UNITED STATES OF AMERICA,          )
6                                      )
                        Plaintiff,     )
7                                      )
             vs.                       ) NO. CR 21-485-DSF
8                                      )
   MARK RIDLEY-THOMAS,                 )
9                                      )
                        Defendant.     )
10   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16              Los Angeles, California

17          Friday, March 24, 2023, 7:45 A.M.

18

19     Day 12 of Jury Trial, Page 2992 to 3068, Inclusive

20

21

22                              WIL WILCOX, CSR 9178
                                Official Reporter
23                              First Street Courthouse
                                350 West 1st Street
24                              Room 4311
                                Los Angeles, CA 90012
25                              wil.wilcox@gmail.com

| | |
|---|---|
| 1 | MR. MORSE:  Thank you, Your Honor. |
| 2 | REBUTTAL ARGUMENT |
| 3 | BY MR. MORSE: |
| 4 | Good morning, ladies and gentlemen. |
| 5 | THE JURORS:  Good morning. |
| 6 | MR. MORSE:  This is a case about a public |
| 7 | official, the Defendant, who used his position as a public |
| 8 | official and all of the resources that came with it as a |
| 9 | tool, as a tool to extract things of value from |
| 10 | Dean Marilyn Flynn. |
| 11 | Sometimes he did things in his official capacity |
| 12 | for Dean Marilyn Flynn that he had already intended to do. |
| 13 | Sometimes he did things for Dean Marilyn Flynn in his |
| 14 | official capacity that he would not have otherwise done. |
| 15 | Sometimes he did just enough to get Marilyn Flynn to give |
| 16 | him things of value.  But at all times, he used his position |
| 17 | as a public official to get things of value from |
| 18 | Dean Marilyn Flynn.  And, otherwise, he monetized his |
| 19 | position as a public official.  That, he was not entitled to |
| 20 | do.  That's illegal.  And that's why you're here today. |
| 21 | Now, the defense has argued:  Well, there's |
| 22 | nothing to see here.  It's all just a big coincidence.  It |
| 23 | may look bad, but it's not illegal. |
| 24 | The government agrees it does look bad, but that's |
| 25 | because it is illegal. |

1              So I want to get into, first, what we began to

2    touch on yesterday; and that is, the things that you can

3    consider in reaching your decision in this case.

4              The only things you can consider are the testimony

5    that you heard from the witnesses, the exhibits that the

6    Court has admitted into evidence, the stipulations in this

7    case -- that is, the facts that are agreed upon by the

8    parties -- and the jury instructions.  And we'll talk about

9    a couple of the jury instructions in a moment.

10             But everything outside of that circle that you see

11   on your screen are things that you cannot properly consider

12   in reaching your decision in this case.

13             You cannot base your decision on sympathy.

14   You cannot base your decision, as the Court said, on any

15   consideration of punishment.  You cannot base your

16   opinion on speculations, the what-ifs, the could-be's.

17   You cannot base your opinion on your -- excuse me -- your

18   vote or your verdict on your personal opinions of the law

19   or the case.

20             This isn't about public opinion.  This isn't

21   about politics.  It doesn't matter if you agree with the

22   Defendant's politics or not.  You can't -- you have to

23   put your prejudices aside.  This isn't about likes or

24   dislikes.  This isn't about personality.  This isn't about

25   character.  This is about conduct, and this is about the

1    evidence.  And that's what you must base your decision on in

2    this case.

3            And with respect to the jury instructions, I

4    just want to highlight a couple of things for you so

5    that we're clear.  And, of course, you'll get the jury

6    instructions back in the deliberation room.  The Court has

7    given you its instructions, and that's what you must base

8    your decision on.

9            But, specifically, I want to point out an aspect

10   of the bribery charge because it's become relevant in this

11   trial.  It is not a defense that any acts taken in this case

12   were for the good of the community or were acts that the

13   Defendant would have or should have taken without the bribe.

14   In other words, even if he were going to do certain things,

15   if he did those things and he accepted a reward for those

16   things, it's still bribery.

17           For honest services mail and wire fraud, the

18   government does not have to show or prove that the

19   official -- in this case, the Defendant -- ever actually

20   intended to perform an official act or that the official

21   act ever in fact happened, provided that we prove that the

22   Defendant agreed to perform an official act.

23           And that agreement can be implicit.  That

24   agreement can be based on an unspoken understanding, winks

25   and nods, and it can be based on the overall surrounding

```
 1   School of Social Work.  And at the same time, he knows
 2   that his son's application is essentially in front of
 3   Dean Marilyn Flynn.  In other words, she's told
 4   Sebastian Ridley-Thomas:  We're going to give you a free
 5   ride.
 6          But nothing's been finalized.  And, in fact,
 7   you'll see, at the end of the year, it had not been
 8   finalized.  So as he's voting in a way that benefits
 9   Dean Marilyn Flynn, who is a contractor with the county, who
10   has business in front of the county, who wants things from
11   the county?  Specifically, the Defendant.
12          He's just voting for this like no big deal.
13   Yeah, I know my son has an application.  I know I've been
14   talking to Dean Marilyn Flynn, the dean of that school,
15   about him getting into that school.  But I still feel
16   comfortable voting in a way that is financially beneficial
17   to that school as a result of a request specifically from
18   that dean.
19          That is called a conflict of interest.
20          Multiple witnesses were asked on cross-examination
21   if --
22          MS. DURIE:  Your Honor, I object to that.
23          THE COURT:  Ladies and gentlemen, you'll be the
24   judges of what the evidence shows.
25          MR. MORSE:  Multiple witnesses testified in
```

this trial, and they were asked on cross-examination or
direct examination:  Hey, did you know the nature and
the scope of the relationship between the Defendant and
Marilyn Flynn?

          And they said:  No.

          And we'll get to that a little bit.

          But for some of them, this would have been a
problem.  Even Marilyn Flynn understood this could be a
problem in the context of Sebastian Ridley-Thomas.  She
doesn't have a problem with this, though, because she knows
what's going on, a favor for a favor.

          So he does this, and she's thrilled about it.  She
says:  This is what I had hoped would happen.

          And defense counsel has suggested, well, this was
already inevitable.  This was a *fait accompli*, like, this
was always going to happen.

          Well, why?  Why doesn't Marilyn Flynn think so?
If the cake is baked, why is she still in the kitchen trying
to get it finished?

          The reason is because she understands that the
sausage making takes time, and some things just don't ever
come to fruition, even if they're discussed and anticipated
and even desired.  So when she sees the plane being landed
by the Defendant, she's cheering him on, right on the
runway, because this is what she wanted.

         So he votes on this item.  No problem.  It's okay
to vote for contractors and people who are -- who have some
impact on family members who are close to you.

         MS. DURIE:  Your Honor, I object to that.  That
misstates the law at issue in this case.

         THE COURT:  Mr. Morse --

         MR. MORSE:  I'll move on, Your Honor.

         THE COURT:  -- move on.  Thank you.

         MR. MORSE:  So here's my question:  If all of this
stuff was inevitable, why now?  Why did the agenda items
that Marilyn Flynn wanted to happen, why did they happen
after that meeting in the office with the Defendant and
Marilyn Flynn?

         Think about it.  Telehealth had been failing for
some time.  We have exhibits, one of them is 1095, where
Jim Wind is saying, "The project" -- referring to Telehealth
-- "is going along, but it's still not producing enough
clients."  In other words, it's not getting enough revenue.
Where was the Defendant when Telehealth was failing?  He was
nowhere to be found.  He wasn't taking any action to help
Telehealth.

         The Vermont Probation Office that we've just
discussed in the previous vote, the August 1st vote,
according to the defense, this is something that had been
discussed for years.  Why did it only come to fruition in

1    this other nonprofit organization?

2              And she said:  Well, educational institutions

3    don't need to report their donations.

4              Exactly.  No paper trail whatsoever.  No paper

5    trail that the Defendant funneled the money or sent it to

6    USC.  No paper trail, according to Ann Ravel, that USC

7    reported it.  And paper trail in the same way in the context

8    of a campaign disclosure, a campaign donation disclosure.

9              And she was sort of asked some common sense

10   questions.  Again, this case is just permeated with the idea

11   of common sense.

12             Hey, Ms. Ravel, you've testified in front of

13   Congress about so-called dark money; isn't that correct?

14             And she says:  Yeah.

15             And you agree that it's an issue when political

16   candidates or political campaigns or political money is sent

17   places and we can't trace exactly where it's from.  There's

18   an issue with transparency.

19             She said:  Yes.  And I still stand by that.

20             And you'd agree, also, that campaign disclosure

21   forms are all about transparency.  We want to know where the

22   money's coming from and who's it going to.

23             And she said:  Yes.

24             And then she was asked:  Well, this is whole thing

25   is okay to you?

1    Dean Discretionary Fund?  That's an explanation that
2    completely ignores that all of this was done at the
3    direction of the Defendant.  And that's not an explanation
4    at all.
5            And the real reason is because the Defendant
6    didn't want -- he understood now that there would be
7    political optics around funneling or sending $100,000 to
8    an organization that impacted his son.  And the other
9    thing is, maybe no one would do it.  Community Partners
10   wouldn't do it.
11           And defense counsel argued that Paul Vandeventer
12   had been told by a lawyer that Community Partners could
13   accept the $100,000 donation.  And, I guess, the argument is
14   therefore, that was then relayed over to the Defendant, who
15   may have relied on that attorney advice that he personally
16   didn't even get.  But the problem with that explanation is,
17   that's not what the Defendant did.  He did not directly
18   donate.  If he had in his mind:  Oh, I think it's a -- I
19   guess it's okay to donate directly to my son's organization.
20           That's not what he did.  He did it in a circuitous
21   way.  He did it in a way to disguise things.
22           A lot of this trial has been about a political
23   agenda and the Defendant being a champion of the people and
24   all that kind of stuff, and maybe that was true.  But this
25   is not consistent with that.  And this is about his conduct,

1   nothing else.  And his conduct was secretive, and it

2   essentially lost Dean Flynn her job.  But Dean Flynn thought

3   it was worth it.  And the Defendant thought she may say yes,

4   and she did.

5          What was her reward?  She completes that payment

6   in and around May 8th, May 9th.  On May 10th, she has a

7   meeting with John Sherin.  And what do you know?

8   John Sherin and Dean Marilyn Flynn happen to be discussing

9   the Telehealth renegotiation contract, just days later.

10         If you recall, she had told Adriana Gonzalez that:

11  If I don't get this payment out, I'm going to get in

12  trouble.

13         She got the payment out.  She did not get in

14  trouble.  She got rewarded.  And this was her reward.

15         And if you recall the testimony of

16  Michele Guzman-Clark.  She said that they had these weekly

17  leadership meetings.  And on May 14th, 2018, Marilyn Flynn

18  announced to the leadership at the School of Social Work:

19  We got the Telehealth contract.

20         Why did she feel comfortable announcing that?

21  Because she knew that mission accomplished.  She didn't get

22  in trouble.  She got rewarded.  And now she felt comfortable

23  letting everybody know.

24         And the defense has argued that -- I guess through

25  insinuation, that USC had some -- there's some conspiracy at

USC that USC went to the U.S. Attorney's Office because they

had some nefarious intent or -- it's unclear exactly what

that would be.

        But ask yourself, this is a picture of the

Defendant giving the commencement address at this

Price School of Public Policy on May 11th, 2018.  On that

same day, he's exchanging emails with Dean Marilyn Flynn

in the aftermath of the funneling of the $100,000 while

he's speaking to Public Policy students.

        So ask yourself:  Did USC have any kind of grudge

against the Defendant?  They held him up as one of their

most prestigious alumni.  He was giving speeches to

commencement -- commencement addresses to students while he

was on his phone arranging shady funneling through the USC

school.

        But I guess it's the USC who is somehow

responsible for all the emails you're going to see when you

go back into the jury deliberation room.  You make the call

on that one, but the evidence just doesn't support that.  It

does not.

        Remember the law.  Remember that there's no legal

defense that acts that the public official would have or

should have taken without the bribe.  It doesn't matter

whether the Defendant was always going to vote in favor of

these amendments or contracts or if he was always going to

1    do what he did.

2           If you believe that the Defendant used his

3    position as a tool to extract benefits from Marilyn Flynn,

4    even if it was to deceive her and make him think -- make her

5    think that he was doing things that he was always going to

6    do, if you think that he was using that position as leverage

7    or a bargaining chip, that's it.  If he meets all the other

8    elements, that's it.  Because public officials aren't

9    allowed to do that.

10          I'll leave you with these two questions that I

11   think summarizes this case.  First, ask yourself:  Was

12   Dean Marilyn Flynn giving the Defendant these benefits in

13   the form of what she did for Sebastian Ridley-Thomas, in

14   the form of funneling those $100,000?  Was she doing that

15   because she believed that the Defendant would do things for

16   her on the county side?

17          The answer to that question is clearly yes.

18          In the interests of showing MRT we can deliver,

19   blah, blah.

20          There's so many emails that shows -- you know, the

21   Karen Bass email about full scholarship for our funds.

22   There are so many emails that show what Marilyn Flynn's

23   intent was and what she was doing and why she was doing it.

24   All right.  But that's the threshold question:  Was she

25   doing it for that reason?

3068

```
 1                      CERTIFICATE

 2

 3          I, WIL S. WILCOX, CSR 9178, hereby certify that

 4    pursuant to Section 753, Title 28, United States Code, the

 5    foregoing is a true and correct transcript of the

 6    stenographically reported proceedings held in the

 7    above-entitled matter and that the transcript page format

 8    is in conformance with the regulations of the Judicial

 9    Conference of the United States.

10
      Date:  March 25, 2023
11

12

13

14

15                         /s/_____

16                         WIL S. WILCOX, OFFICIAL REPORTER
                           CSR NO. 9178
17

18

19

20

21

22

23

24

25
```

# EXHIBIT 576



Los Angeles County
## DEPARTMENT OF MENTAL HEALTH

# ADOPTED
BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES

July 31, 2018

27   July 31, 2018

*Celia Zavala*

CELIA ZAVALA
ACTING EXECUTIVE OFFICER

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

**DELEGATE AUTHORITY TO EXTEND THE SOLE SOURCE TELE-MENTAL HEALTH SERVICES AGREEMENT WITH THE UNIVERSITY OF SOUTHERN CALIFORNIA FROM SEPTEMBER 1, 2018, THROUGH AUGUST 31, 2019**
**(ALL SUPERVISORIAL DISTRICTS)**
**(3 VOTES)**

## SUBJECT

Request delegated authority to extend the sole source Agreement with the University of Southern California for the provision of tele-mental health services for the period of September 1, 2018, through August 31, 2019.

**IT IS RECOMMENDED THAT THE BOARD:**

1. Delegate authority to the Director of Mental Health (Director), or his designee, to prepare, sign, and execute an amendment to the sole source Agreement with the University of Southern California (USC) on behalf of its USC Telehealth, substantially similar to Attachment I, to extend the term for one year effective September 1, 2018, through August 31, 2019.

2. Delegate authority to the Director, or his designee, to prepare, sign, and execute amendments to the Agreement to sustain the program throughout the term, provided that sufficient funds are available, including but not limited to: provision of administrative non-material changes; provision of additional/related services; and/or modifications to reflect changes to an existing Statement of Work; federal, State, and County regulatory and/or policy changes, subject to prior review and approved as to form by County Counsel, with notice to the Board and CEO.

3. Delegate authority to the Director, or his designee, to terminate the Agreement in accordance with

USAO_129503

**Exhibit 576**
**Page 1 of 68**

The Honorable Board of Supervisors
7/31/2018
Page 2

the Agreement's termination provisions, including Termination for Convenience, provided the Director notifies your Board and the CEO in writing of such action.


## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

On March 1, 2016 your Board approved the execution of an Agreement with the University of Southern California (USC) to provide tele-mental health services (TMHS) to children and Transition Age Youth (TAY). Extending the Agreement will allow for uninterrupted TMHS to an estimated 300 children and TAY clients during the period of September 1, 2018, through August 31, 2019. Furthermore, it will allow DMH additional time to assess the effectiveness of the program.

Potential program participants who present mild to moderate psychiatric symptoms are referred to the USC TMHS program for intake assessments. If the outcomes of such assessments confirm that potential program participants do not require a higher level of care, they are enrolled in the TMHS program and receive mental health services online via a secure Internet portal maintained by USC. The services are delivered by Licensed Clinical Social Workers (LCSW) and trained/supervised Masters of Social Work (MSW) student interns using the Seeking Safety (SS), Crisis Oriented Recovery Services (CORS), Cognitive Behavioral Therapy (CBT), and Cognitive Behavioral Intervention for Trauma in Schools (CBITS) evidence-based practice (EBP) models. These services are consistent with the MHSA Prevention and Early Intervention (PEI) plan and are funded by MHSA revenue.

Through this early intervention model, children (ages 12 to 15) and TAY (ages 16 to 21) who have experienced or have been witness to traumatic events, such as child sexual abuse, domestic violence, traumatic loss, and/or who are diagnosed with or experiencing difficulty related to symptoms of Post-Traumatic Stress Disorder (PTSD), depression, anxiety, or co-occurring disorders, are provided TMHS to ameliorate the impact of the traumatic events, reduce trauma-related symptoms, increase resilience and increase peer and parental support. Additionally, the tele-mental health service model improves access to mental health services for children and TAY in underserved populations who do not pursue these services due to lack of awareness of available services, access issues such as transportation or mobility limitations, or reluctance due to stigma and/or discrimination.

Initially, TMHS were only available to clients referred by Department of Mental Health (DMH) social workers at the Martin Luther King Jr. (MLK) Hub and other County Medical Hubs. Program staff identified that the tele-mental health model is most effective with older youth and young adults and the agreement was amended effective, August 1, 2017, to allow DMH staff to refer clients at other DMH directly-operated or contracted agencies, including County DCFS offices, TAY drop-in centers, and school districts throughout Los Angeles County.  Participation of youth and young adults has increased with expansion to these other locations. Extending the TMHS program will allow an additional year to gather data on the effectiveness of TMHS, especially from the participants referred to the program since August 1, 2017, including those affected by deportation issues, intimate partner violence, and school violence, and allow for in-person mental health services, when appropriate.

Board approval of Recommendation 1 will enable DMH to continue to provide and expand access to mental health services both in person and through video-conferencing technology for children and TAY.

Board approval of Recommendation 2 will allow DMH to amend the Agreement expeditiously to sustain the program throughout the term specified.

USAO_129504

**Exhibit 576**
**Page 2 of 68**

The Honorable Board of Supervisors
7/31/2018
Page 3

Board approval of Recommendation 3 will enable DMH to terminate the Agreement in accordance with the Agreement's termination provisions, including termination for convenience.

**Implementation of Strategic Plan Goals**

These recommendations support the County's Strategic Plan Goal I, "Make Investments That Transform Lives," specifically Strategy I.2.9, "Support the Long Term Success of Transitional Aged Youth" and Strategic Plan Goal III, "Realize Tomorrow's Government Today," specifically Strategy III.2.2, "Leverage Technology to Increase Visibility of and Access to Services."

**FISCAL IMPACT/FINANCING**

There is no fiscal impact for this extension of agreement. The Total Contract Amount (TCA) will remain at $530,323 for the term of the agreement, fully funded by State MHSA revenue.

There is no net County cost impact associated with the recommended action.

**FACTS AND PROVISIONS/LEGAL REQUIREMENTS**

On June 25, 2013, in response to a child fatality, your Board approved a motion for the Blue Ribbon Commission (BRC) to address issues of child safety. Beginning in August of 2013, the BRC held 17 meetings and published its Final Report in April 2014. The BRC issued a set of recommendations, including articulating a countywide mission to prioritize and improve child safety. On July 28, 2015, following consultation with Supervisorial District 2 and senior leadership at DMH, DCFS, and the Department of Health Services (DHS), USC submitted a project proposal to DMH aimed at serving children and youth who have come to the attention of the child welfare system but remain with their families of origin and present with early onset of mild to moderate psychiatric symptoms.

This project aligns with the BRC's recommendations for a countywide safety system to support "access to and delivery of critical mental health services" and ensure that "mental health treatment for teens and transitioning age youth incorporate trauma-focused assessment and interventions appropriate to the developmental status, ethnicity, sexual identity, and risk factors of the youth being served."

The USC Tele-mental health program is a large-scale, virtual behavioral health clinic operated as part of USC's School of Social Work. The clinic is staffed with experienced LCSW and trained/supervised MSW student interns. In order for USC to continue to provide mental health services, it is required to contract with DMH, as the Local Mental Health Plan (LMHP). The existing sole source TMHS Agreement between LA County and USC is set to expire on August 31, 2018.

The Amendment format, Attachment I, has been approved as to form by County Counsel. DMH administrative staff will monitor USC's performance and compliance with Contract provisions and departmental policies.

In accordance with Board Policy 5.100, Sole Source Contracts, Attachment II is the March 2, 2018, Board memorandum notifying your Board of DMH's intent to extend the sole source Agreement with USC for the provision of TMHS through August 31, 2019.

**IMPACT ON CURRENT SERVICES (OR PROJECTS)**

USAO_129505

**Exhibit 576**
**Page 3 of 68**

The Honorable Board of Supervisors
7/31/2018
Page 4


Approval of the recommended actions will allow USC to provide tele-mental health services to children and transition age youth, continuing the availability of these services to an underserved population and lessening the burden on County facilities.


Respectfully submitted,


JONATHAN E. SHERIN, M.D., Ph.D.
Director


JES:GP:TB:SK:rlr

Enclosures

c:   Executive Office, Board of Supervisors
     Chief Executive Office
     County Counsel
     Chairperson, Mental Health Commission


USAO_129506

**Exhibit 576**
**Page 4 of 68**

# EXHIBIT 1076





ROBIN KAY, PH.D.
Acting Director

DENNIS MURATA, M.S.W.
Acting Chief Deputy Director

RODERICK SHANER, M.D.
Medical Director

March 01, 2016

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

```
U.S.D.C Central District of California
      Case No:   21-cr-00485-DSF
      USA v. Mark Ridley-Thomas

          DTX-1076

Date Entered: _____

By: _____

         Deputy Clerk
```

Dear Supervisors:

**AUTHORIZATION FOR A SOLE SOURCE AGREEMENT WITH UNIVERSITY OF SOUTHERN
CALIFORNIA FOR TELE-MENTAL HEALTH SERVICES
(ALL SUPERVISORIAL DISTRICTS)
(3 VOTES)**

## SUBJECT

Request approval to enter into a sole source agreement with the University of Southern California for the provision of tele-mental health services.

**IT IS RECOMMENDED THAT THE BOARD:**

1.  Approve and instruct the Acting Director of Mental Health (Acting Director), or her designee, to prepare, sign, and execute an agreement, substantially similar to Attachment I, with the University of Southern California (USC) for the provision of tele-mental health services to children or transition age youth (TAY) referred by Department of Mental Health (DMH) social workers assigned at the Martin Luther King, Jr. (MLK) Medical Hub Clinic, or one of the County's other medical hubs.  The term of the Agreement will be commencing upon your Board's approval and continue through August 31, 2017, (approximately 18 months), with an option for the Acting Director to extend the term for up to an additional 12 months.  The agreement's Total Contract Amount (TCA) through August 31, 2017, is $547,500, funded by State Mental Health Services Act (MHSA) revenue.  Should the term of the Agreement be extended for an additional 12 months, the TCA for the optional extension period is $365,000, funded by MHSA revenue.

2. Delegate authority to the Acting Director, or her designee, to prepare, sign, and execute future amendments to this agreement, provided that: 1) any future amendments are necessary to meet program needs; 2) any increase to the TCA does not exceed 10 percent of the TCA that your Board

MRT_004726

The Honorable Board of Supervisors
3/1/2016
Page 2

is being asked to approve in Recommendation 1; 3) your Board has appropriated sufficient funds for all changes through the annual budgeting process; 4) approval by County Counsel, or her designee, is obtained for any such amendment; and 5) the Acting Director notifies your Board and Chief Executive Office of agreement changes in writing within 30 days after execution of each amendment.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

Board approval will authorize DMH to execute an agreement with USC for the provision of tele-mental health services to children and youth referred by DMH social workers at the MLK Medical Hub Clinic, or one of the other County medical hubs.  The USC Telehealth program is a large-scale, completely virtual behavioral health clinic operated as part of USC's School of Social Work.  The clinic is staffed with experienced Licensed Clinical Social Workers (LCSW) and trained/supervised Masters of Social Work (MSW) student interns.  Potential program participants who present with mild to moderate psychiatric symptoms will be referred by DMH social workers to the USC Telehealth program for intake assessments.  If the outcomes of such assessments confirm potential program participants do not require a higher level of care, they will be enrolled into the program and receive mental health services online (i.e., tele-mental health services) via a secure Internet portal maintained by USC.  The services will be delivered by USC LCSWs and MSW student interns using the Seeking Safety (SS) and Crisis Oriented Recovery Services (CORS) evidence-based practice (EBP) models.  These services are consistent with the MHSA Prevention and Early Intervention (PEI) plan and will be funded by MHSA revenue.

### Implementation of Strategic Plan Goals

The recommended actions are consistent with the County Strategic Plan Goal 3, "Integrated Services Delivery."

## FISCAL IMPACT/FINANCING

The cost for the Initial Term of this agreement is $547,500, funded by State MHSA revenue. Sufficient appropriation and funding is included in DMH's Fiscal Year 2015-16 Final Adopted Budget. There is no County cost impact associated with this action.

## FACTS AND PROVISIONS/LEGAL REQUIREMENTS

On June 25, 2013, in response to a child fatality, your Board approved a motion for the Blue Ribbon Commission (BRC) to address issues of child safety.  Beginning in August 2013, the BRC held 17 meetings and published its Final Report on April 2014.  The BRC issued a set of recommendations, including articulating a countywide mission to prioritize and improve child safety.  On July 28, 2015, following consultation with the Supervisorial District 2 and senior leadership at DMH, Department of Children and Family Services (DCFS), and Department of Health Services (DHS), USC submitted a project proposal to DMH aimed at serving children and youth who have come to the attention of the child welfare system but remain with their families of origin and present with early onset of mild to moderate psychiatric symptoms.

The agreement format (Attachment I) has been approved as to form by County Counsel.  DMH administrative staff will monitor USC's performance and compliance with agreement provisions and departmental policies.

MRT_004727

The Honorable Board of Supervisors
3/1/2016
Page 3


The Sole Source Checklist approved by the CEO is also attached (Attachment II).


## CONTRACTING PROCESS

In accordance with the Board of Supervisors Policy Manual, Section 5.100, Sole Source Contracts, DMH presented the Sole Source Notification to the Health Cluster Agenda Review on December 16, 2015. The Board memo dated December 23, 2015, (Attachment III) was sent to your Board following the Health Cluster Agenda Review.

USC is a unique provider that brings a combination of experience and expertise in evidence-based mental health care, research/program evaluation, technology, and child welfare, coupled with philanthropic financial support for the proposed partnership with DMH.  Over the past three years, the USC Telehealth program has served on-line over 1,500 highly diverse, therapy clients in their homes.  For this program, in order to increase access to mental health services, USC's Telehealth program, using its own funding, will provide an iPad to each client who does not have access to the Internet or a home computer.  This telehealth program will be the first and only completely virtual, home based mental health service program for youth at risk of being detained by DCFS.


## IMPACT ON CURRENT SERVICES (OR PROJECTS)

This project aligns with the BRC's recommendations for a countywide safety system to support "access to and delivery of critical mental health services" and ensure that "mental health treatment for teens and transitioning youth incorporate trauma-focused assessment and interventions appropriate to the developmental status, ethnicity, sexual identity, and risk factors of the youth being served."


Respectfully submitted,

*Robin Kay, Ph.D*

ROBIN KAY, Ph.D.
Acting Director of Mental Health


RK:BM:RB:sk

Enclosures

c:   Executive Office, Board of Supervisors
     Chief Executive Office
     County Counsel
     Chairperson, Mental Health Commission


MRT_004728

**Defendant's Trial Exhibit 1076, page 3 of 115**

**ATTACHMENT I**



**CONTRACT**

**BY AND BETWEEN**

**COUNTY OF LOS ANGELES**

**DEPARTMENT OF MENTAL HEALTH**

**AND**

**UNIVERSITY OF SOUTHERN CALIFORNIA**

**ON BEHALF OF ITS USC TELEHEALTH**

**FOR**

**TELEMENTAL HEALTH SERVICES**

MRT_004729

Defendant's Trial Exhibit 1076, page 4 of 115

requirements stipulated in this Agreement.

(b)     Contractor shall be responsible to ensure claims are submitted in a timely manner. Contractor shall be solely liable and responsible for the accuracy and veracity of all data and information provided by Contractor to County.

3.     <u>Claiming for Specialty Mental Health Visits in the Same Day</u>:

If County determines that Contractor has submitted claims beyond the allowable number of visits as described in Paragraph B, CLAIMING, for the same Eligible Client on the same day under this Agreement, then County shall be entitled to recover from Contractor all inappropriate payment amounts received by Contractor.   Contractor shall be entitled to retain only the amount it would have been entitled to receive for as specified in Paragraph B for an allowable visit.

**C.     <u>REIMBURSEMENT</u>**

1.     <u>Rates</u>:  County agrees on the terms and conditions set forth in this Exhibit and in this Agreement, to compensate Contractor for services provided to Eligible Clients for the provision of specialty mental health.   For the duration of the contract term, Contractor shall be reimbursed at the pre-established per visit rate of **<u>EIGHTY-NINE DOLLARS</u>** ($89.00) for specialty mental health services as defined under this Agreement.

2.     <u>Maximum Contract Amount</u>:     Contractor understands that services provided are funded using Mental Health Services Act (MHSA) Prevention and Early Intervention (PEI) funds.  County's reimbursement to Contractor is contingent upon the availability of State MHSA PEI funds and Contractor's adherence to all MHSA PEI requirements.

For purposes of budgetary planning for the parties, and not as a means to restrict services, the following shall constitute the maximum amount for specialty mental health services that County shall pay Contractor while this Agreement is in effect：

(a)     County's reimbursement to Contractor for _____, 2016, through August 31, 2017, shall not exceed **<u>FIVE HUNDRED FORTY-SEVEN</u>**

MRT_004811

Defendant's Trial Exhibit 1076, page 86 of 115

**THOUSAND FIVE HUNDRED** Dollars ($547,500) for the provision of specialty mental health services.

(b)      County at its sole discretion may reduce this maximum contract amount in the event that County believes, based on evidence of Contractor's level of utilization, that the amount exceeds what Contractor would reasonably be expected to need during the term of this Agreement. County may allocate such funds to other providers.  County shall provide notice to Contractor of such change and shall implement such reduction through an administrative amendment.

3.      Notice Regarding Utilization of Estimated Maximum Contract Amount: Contractor shall inform County when up to 75 percent (75%) of the estimated maximum amount has been incurred.  Contractor shall send such notice to those persons and addresses which are set forth in Paragraph 8.35 (NOTICES) of the Agreement.

4.      County's Reimbursement:  County shall pay one hundred percent (100%) of complete and timely submitted electronic and/or manual claims for covered specialty mental health services to Eligible Clients submitted by Contractor pursuant to the terms of this Exhibit on a monthly basis in accordance with County's Accounts Payable procedures.

**D.   PAYMENT DISALLOWANCES**

1.      County will reimburse Contractor for Eligible Clients only.  If, at any time, specialty mental health services are provided to non-eligible clients, County will recover from Contractor any payment made for said services. County, on an annual basis, will reconcile and recoup non-allowable amounts reimbursed to Contractor after reviewing claims data submitted by Contractor.

2.      Contractor shall adhere to requirements related to exclusion of multiple same-day visits.  County will recover overpayments related to claiming of multiple same-day visits as provided in Paragraph B (CLAIMING) of this Exhibit.

3.      County reserves the right to recover all payments stemming from disallowed

**Defendant's Trial Exhibit 1076, page 87 of 115**

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on October 2, 2023 the within document was filed with

3 the Clerk of the Court using CM/ECF which will send notification of such filing to

4 the attorneys of record in this case.

5

6                                                    */s/ Galia Z. Amram*
                                                  GALIA Z. AMRAM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28